[No. S056997. June 30, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL McCREA WHISENHUNT, Defendant and Appellant.

**COUNSEL**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Mary K. McComb, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Mary Jo Graves and Dane R. Gillette, Chief Assistant Attorneys General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey, Kenneth C. Byrne and Keith Borjon, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**CHIN, J.**—On October 10, 1995, 19-month-old Kesha Gurke died of severe internal injuries and third degree burn wounds she received in the home where she lived with her mother, Jeanette Hill, and her mother's boyfriend, defendant Michael McCrea Whisenhunt. On August 22, 1996, a San Luis Obispo County jury found defendant guilty of first degree murder and found true the special circumstance that the murder was intentional and involved the infliction of torture. (Pen. Code, §§ 187, 189, 190.2, subd. (a)(18).)[1] After the penalty phase, the jury returned a verdict of death. The trial court denied defendant's motion for new trial and modification of the penalty (§ 190.4, subd. (e)), and sentenced him to death. This appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).)

For reasons discussed below, we affirm the judgment in its entirety.

## I. FACTS

### A. *Guilt Phase*

#### 1. *The Prosecution's Case*

##### a. *Kesha's Birth and Early Life*

Kesha Gurke was born on February 14, 1994. Her mother, Jeanette Hill, had met Kesha's father, Jeff Gurke, in junior high school, and had just turned 18 years old when she gave birth to Kesha. Hill's relationship with Jeff Gurke ended in May 1995, and he left town shortly thereafter. Defendant, who was 30 years old, met Hill at her 19th birthday party in January 1995. Although Hill's relationship with defendant was initially platonic, in June 1995, she and Kesha moved into defendant's apartment in Paso Robles, a one-room converted garage, where they would live until Kesha's death four months later on October 10. About a month after moving in together, Hill and defendant developed a romantic relationship. Defendant was sent to jail for about a month and a half during the summer, but returned to the apartment in August.

When Hill and Kesha first moved in, defendant got along very well with Kesha. But after defendant's incarceration and return, Kesha appeared not to like him anymore. Defendant's conduct towards Kesha also changed. Kesha's

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

whining and crying got on defendant's nerves and he responded by yelling or swatting her on the buttocks. Hill objected to this kind of discipline, but defendant stated that this was how he believed she should be raised. Kesha became less comfortable with defendant as time went on. Whenever she heard defendant's car drive up, she would cling to her mother. When defendant entered the room, Kesha would just sit and stare into space.

### b. *Signs of Abuse*

Hill first noticed that Kesha had injuries in August 1995, after defendant returned from jail. Hill noticed bruises on Kesha's leg, including one on the side of her thigh that lasted for weeks. In September, Hill visited the home of one of her friends, Kelly Salay, who noticed a bruise in the shape of a handprint on Kesha's thigh. Hill believed the bruise had been caused by the faucet when Hill bathed Kesha in the sink, and told Salay that. During the same visit to Salay's house, defendant became annoyed with Kesha because she kept crying. He grabbed her by the arms, and yelled at her to shut up. Around this time, Hill also noticed bruises down either side of Kesha's spine, chest, stomach and face, which she did not think she had caused. When she asked defendant about these bruises, he became defensive and stated he loved Kesha, and explained away the bruises as the results of accidental falls.

Kesha had a black eye a few days before she died. Hill did not ask defendant about the black eye. Kesha's babysitter, Crystal Smith, also noticed the black eye and a small cut under Kesha's eye after she and Hill returned from shopping. Defendant told Smith that Kesha got the black eye when she fell down some steps. Smith noticed that Kesha usually became quiet when defendant was around.

In the days before Kesha's death, Hill noticed a lock of Kesha's hair on the tray on her high chair, some of Kesha's hair on the bathroom floor, and red dots on Kesha's head where the hair was missing. When Hill asked defendant about Kesha's hair, he said that it came out when he was brushing it. Sarah Semple, a friend of Hill's, noticed that Kesha started losing her hair in September, and that she had bald spots.

### c. *Emergency Room Visits and Medical Examinations*

Around September 29, Hill took Kesha to the emergency room because Kesha was sleeping all day, had a fever, did not eat, and had diarrhea. Dr. Thomas Richards examined her and prescribed antibiotics. He noticed bruises on Kesha's spine, chest, and left thigh, suspected they were the result

of child abuse, and asked Hill about them. Hill repeated defendant's explanation that most of the bruises were caused by falls while playing with other children, but said she did not know what caused the bruises on Kesha's spine. Dr. Richards told Hill to bring Kesha back the next day, and reported his suspicions to the San Luis Obispo County Child Protective Services Department and to Kesha's regular pediatrician.

Defendant arrived separately at the emergency room. He was angry because he had wanted Hill to wait and only bring Kesha to the hospital if she had not gotten better in another couple of days. He was worried that he was going to be accused of causing the bruises because he was an ex-convict, and that the authorities would take Kesha away from Hill. Hill and Kesha stayed at a friend's house that night.

The next day, Hill took Kesha back to the emergency room, where Dr. Greg Frye examined her. He noted that Kesha was feeling better, but he observed bruises on Kesha's back and chest. He also noted that the hair on her scalp was slightly thinner than normal. Dr. Frye told Hill to follow up with Kesha's regular pediatrician, Dr. Richard Peterson, whom they saw on October 4. By the time Kesha saw Dr. Peterson, she was almost back to her normal self, and there was no sign of infection. Dr. Peterson conducted a complete physical examination in response to Dr. Richard's report of possible abuse, but Dr. Peterson did not observe any bruises.

### d. *Visit by Child Protective Services*

In response to Dr. Richards's report of possible child abuse, Constance Langer, a child protective services worker, visited defendant's apartment on October 5. Langer examined Kesha and noticed a bruise about the size of a quarter on her forehead above her right eye. Hill told Langer that she caused the bruise while trying to hold Kesha down to apply eye drops for an eye infection. On her outer left thigh was a small fading linear bruise, which Hill attributed to striking the faucet while bathing Kesha in the kitchen sink. Langer told Hill that while Kesha did not look happy, she did not appear to be unhealthy or look like she was being hurt.

### e. *Defendant and Hill's Deteriorating Relationship*

About a week and a half before Kesha was killed, Hill was considering leaving defendant because she felt Kesha was not happy. Defendant told Hill that he had the feeling that she was going to leave him because she had been acting cold and distant. He also told her that he was going to resume dating Brandi Blackburn, his former girlfriend and Hill's best friend.

### f. *Events the Day of the Murder, October 10, 1995*

On October 10, 1995, defendant arrived home around 9:00 or 10:00 a.m., having spent the night elsewhere. He and Kesha took a shower together. Around 2:30 p.m., Hill used defendant's car to take herself and her friend Kelly Salay to run some errands, leaving Kesha with defendant.

In the late afternoon, neighbor David Campa, who lived in a house in front of defendant's converted-garage apartment, heard defendant say, "Get up. That didn't hurt." On previous occasions, Campa had heard a baby crying and defendant saying "shut up" or "stop." This time, he did not hear any crying.

Hill dropped Salay off and returned home about 4:00 or 4:30 p.m. Defendant ran outside the apartment to meet her at the gate and appeared very flustered. He said he wanted to tell her what happened before she went into the apartment and "freaked out." Hill replied, "Something always happens when you are watching her." Defendant said he had been holding Kesha while they were watching a movie, when she defecated on him. He said they had to take another shower together, and that the water burned her, although, inexplicably, it had not burned him. He told Hill he had never seen anything like it before, and that he was "really sorry."

When Hill went inside, Kesha was lying on the floor, her head against the carpet, whimpering and trying to get up against the wall. Hill wanted to take her to the emergency room, but defendant opposed doing so, saying that it was not as bad as it looked. Sometime between 25 and 45 minutes later, Hill asked defendant to go to the store to get some juice for Kesha. Hill applied some Neosporin to her burns just before defendant left. Defendant first went to Salay's house and told her that Kesha had been burned by hot water in the shower. Salay asked how bad the burns were, and defendant told her Kesha was fine. They talked about other things for about 45 minutes to an hour, and then defendant and Salay went to the store, where defendant asked several people there about what would be good for a little girl who was not feeling well and who had burns. He said that Kesha had diarrhea and vomiting, and that her immune system was so weak that she got blisters in the shower. After spending about 15 minutes at the market, he bought some soup and juice and they left. Defendant dropped off Salay and returned home sometime after 5:30 p.m.

Kesha was able to drink the juice defendant had bought. Defendant moved Kesha to the bed, but she went limp while he was holding her. Defendant told Hill to clear out the sink and run some lukewarm water to revive Kesha. She said she wanted to call 911, but defendant yelled at her to run the water. She

complied, but Kesha did not respond. Defendant then tried to administer CPR, and fluid came out of Kesha's mouth. When defendant had his back turned, Hill ran to the house of neighbor David Campa and called 911.

At 6:50 p.m., paramedics received a report of a baby not breathing and arrived at defendant's apartment within one minute. They discovered Kesha lying naked on the floor. She was pale and unconscious, and there were several burns about her body in a splash pattern that appeared to have been caused by a liquid. They determined she was not breathing and had no pulse. They began CPR, but got no response. Questioned by paramedics, defendant stated that Kesha had been fine all day, had been taken into the shower four or five minutes before the paramedics had arrived, and had no problem with the shower. However, when he placed Kesha on the floor, she began coughing up phlegm and stopped breathing.

Taken to the emergency room, Kesha was examined by Dr. Frye, who had previously seen her on her emergency room visit of September 30. Attempts at resuscitation were unsuccessful, and she was declared dead at approximately 7:30 p.m. Dr. Frye noticed numerous bruises of different ages on her body, including ones that had not been present when he previously examined her. She had burns across her body, from her scalp down to her groin area.

### g. Initial Police Investigation

Two police officers, John Hacker and William Seymour, also responded to the 911 call. Defendant told Officer Hacker that he had taken Kesha into the shower about 3:30 p.m. to clean her up after a bowel movement, and that the red marks on her body were apparently a bad reaction to the water, since, as defendant acknowledged, the water was not hot enough to burn him even though he was in the same water at the same time. Defendant said that later in the evening, he was on the couch playing with her when she suddenly stopped breathing. Hill told the officer essentially the same story, but added that Kesha's reaction to the water was due to an unnamed illness. Defendant, however, told Officer Seymour that he thought the water in the shower had been too hot, and that it had burned Kesha. Hill told Officer Seymour that, when she arrived home, she put Neosporin on the burns and that Kesha appeared to be fine.

Detectives arrived on the scene and secured the premises. A detective photographed the interior of the apartment, including the top of the stove, which had a frying pan on it. The frying pan was seized and subsequently analyzed. It contained five empty shrimp tails, and appeared to have contained between 10 and 20 ounces of grease or cooking oil.

Defendant and Hill were arrested and placed together in a police car. Their conversation was secretly recorded and the tape was played to the jury at trial. Defendant told Hill that the only way they could "get away with this" was for Hill to tell the police that she was frying shrimp and accidentally knocked the pan over. Police conducted a taped interview with Hill that night. She stated that when she returned home from having run errands, defendant told her that he had taken Kesha into the shower because she had defecated on him, and that she was burned in the shower. Police then conducted a taped interview with defendant, who had been advised of and waived his *Miranda* rights. (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].) When asked how Kesha was burned, he stated that he had given her a shower because she had vomited on him, and that when he started drying her, her skin began coming off. Police returned to defendant's apartment, tested the hot water, and determined it was not hot enough to have caused Kesha's burns.

### h. *The Autopsy*

A forensic pathologist observed Kesha's injuries at the hospital the night she died, and performed an autopsy on her the following morning. Externally, there were a total of 44 burns across her head, face, neck, back, torso, left arm, and genital area. There were a total of nine abrasions on her forehead, nose, neck, abdomen, and upper thigh. The abrasion on her forehead was consistent with the teeth of a comb striking the area. Abrasions on her abdomen were suggestive of fingernails. There were a total of 34 bruises on her left lower eyelid, temple, cheek, lower jaw, abdomen, back, arm, wrist, thigh, knee, and foot.

Internally, there was extensive bruising in her abdominal wall, her colon, pancreas, large intestine, and right kidney. There was a large laceration of the tissue that supports the colon, and a transection of the small intestine. There had been internal bleeding in the abdominal cavity. Her internal injuries, especially the transection of the intestine and the bleeding into the abdominal cavity, caused her to go into shock, which in turn caused her death. Her burns and bruises were also contributing factors in her death.

There was an injury in the abdomen, which was healing at the time she died and which appeared to be several days old. However, the rest of the injuries were inflicted less than two or three hours before her death. Her internal organs showed no evidence of natural disease. The pathologist believed the burns were caused by a high-temperature viscous oil.

### i. *Further Police Interviews*

After the autopsy, a police detective interviewed Hill and defendant a second time. Hill did not change her story about the events leading up to

Kesha's death. Defendant, however, in an interview that was not recorded, eventually changed his account after being told that the autopsy did not support his story about Kesha's being burned in the shower. When asked whether he had burned Kesha accidentally or intentionally, defendant began to cry, said he had not meant to burn her, and told the following story: Hill had left the apartment to run some errands, and he began frying some shrimp. He felt a tug on his leg, which startled him. He turned with the frying pan in his hand, and the hot butter or grease fell on Kesha. He removed her diaper, took her to the shower, and turned the cold water on to treat her burns. He did not think she was in any great pain.

The detective told defendant that, while the burns were serious and a contributing cause of Kesha's death, she had died from a massive blow to the abdomen. Defendant then stated that, after burning Kesha, he squeezed her very hard, picked her up, and ran into the high chair on the way to the shower. Defendant wrote out a statement repeating what he had told the detective, and stating that he had not meant to hurt Kesha.

The detective checked with the pathologist about defendant's claim that he had squeezed Kesha and ran into a high chair with her. In a third interview, which was also not taped, the detective told defendant that he had been informed that it was impossible for Kesha to have suffered her injuries in the way defendant had described it. Defendant then stated that he now remembered that, as he was running towards the shower with Kesha, he tripped and fell on top of her, which, he stated, may have possibly caused her massive abdominal injuries. When the detective told defendant that investigators had been unable to find a diaper with melted plastic or any grease spots on it, defendant changed his story and claimed that Kesha had not, in fact, been wearing a diaper when she was burned.

### j. *Defendant's Letter to Hill*

Defendant wrote Hill a letter dated October 22, 1995, which she received while she was in jail. Copies of the letter were given to the jury to read. In the three-page letter, among other things, defendant makes the following admissions:

"I wish I'd told you the truth and that we would have taken her in to be checked, she'd still be alive. I believe telling you it was water and not butter you wouldn't think the burns were that bad, we could handle it ourselves."

"I didn't fall just slaped [*sic*] two or three times and that's what killed her."

"I have to live with the fact that I lost something special and a part of me, by my hand."

### k. *Expert Testimony on Kesha's Injuries*

Three physicians testified as expert witnesses on Kesha's injuries. Dr. H. Howard Kusumoto, a pediatrician who specialized in examining suspected victims of physical child abuse, was the child abuse medical examiner who examined Kesha in the emergency room on the night she died. He observed several burns, contusions, and puncture wounds on Kesha's body. He also observed her autopsy the next day. Her internal injuries were caused by a concentrated, very strong force, comparable to the injury a child would suffer from forcefully hitting the dashboard of a car during a traffic accident. Her injuries could have been caused by hitting or kicking, but kicking was more likely. In Dr. Kusumoto's opinion, based on the type of injuries, they were caused by a man, most likely with the front part of his foot. He also opined that the pain caused by Kesha's internal injuries would have been excruciating. Kesha's burns were caused by a viscous liquid, which was hotter than boiling water, and which was either poured or "painted" on her body. The burns were caused by separate applications, and, given the number of burns, they would have been very painful. The burns were irregularly shaped but very well defined, with no evidence of splashing or spilling beyond the edges. This indicated that she was unable to move when the burns were applied.

A pediatrician who specialized in burns, Dr. Matt Young, reviewed the photographs of Kesha's burns. Many of the burns on her chest, neck, chin, and back were third degree burns. Dr. Young opined that, based on their distribution and their depth, the burns were caused by a viscous, sticky liquid, such as hot grease or hot butter. Unlike water, viscous liquids do not drip off the skin, and because grease or oil reaches a higher temperature before boiling than water, it creates a deeper burn. The pattern of the burns indicated that the viscous liquid was intentionally poured or dripped on her. The burns could not have been the result of one accidental event because there were burns both on the back of the neck and under the chin. This also indicated that the child had to change positions, or had her position changed, between these two burns. There were burns on her genitalia and on her back, which also indicated that her position was changed between these sets of burns. In the doctor's opinion, the pattern of the burns was incompatible with an accidental spilling of butter or grease on the victim. The doctor stated that the severity of burn pain is incomparable.

The prosecution's final expert witness was Dr. Roger Williams, a physician specializing in pediatric pathology and child abuse. He reviewed the death certificate, autopsy report, and investigative reports of Kesha's death, together with slides, photographs, and X-rays. All of Kesha's bruises were fresh, that is, they occurred two days or less from the time of her death (with the

exception of the injury around her left eye, which was at least four days old). The pattern of bruises indicated abuse rather than accidental bruising.

Consistent with the prior medical testimony, Dr. Williams testified he believed the burns were caused by a hot viscous liquid, because the burns had uniform sharply demarcated edges and did not display the runny or splattering characteristics one would expect with water. In Dr. Williams's opinion, because the burning material was applied at right angles to the skin and there was no indication of a downward flow of the material, each burn was applied separately, with the victim in a restrained position. He observed that the genitalia is a place where burning does not easily occur accidentally, since the legs are typically held together. In his opinion, in order for the victim to have suffered the large burn she received in this area, Kesha's pelvis would have to be tilted upwards, and her legs spread apart at the time of the burn. He stated that Kesha's fatal internal injuries resulted from "a heel stomp, a really forceful kick" and a "very powerful punch," and that at least two blows, possibly more, were involved.

### l. *Defendant's Prior Acts of Child Abuse*

D. Robertson lived with defendant for about three years, starting in late 1983, and had two children with him, S. and J. Around the time the children were one to three years old, defendant struck both children when they whined or did not behave. He slapped them "upside the back of" their heads, sometimes smacking them so hard that their heads "would bounce off the table." He slapped the children on the head at least one to three times a week. He would also use "karate kicks." He concentrated his kicking on S., kicking her between five and 10 times. Robertson never reported these acts to the police, but she did report them to child protective services.

Defendant separated from Robertson in July 1987, taking the two children with him. Robertson obtained a restraining order against defendant two months later, alleging he had sexually molested S. She made a similar allegation in 1989. However, although the alleged sexual molestations were investigated, defendant was never charged. Robertson eventually regained custody of the two children. She was arrested in 1989 for a shooting incident and was convicted of the misdemeanor of negligently discharging a firearm.

### m. *Hill's Guilty Plea*

Hill was charged with first degree murder for Kesha's death. Before defendant's trial, she pleaded guilty to involuntary manslaughter. Her sentence was one year in jail (or alternatively, six months in jail and six months in a residential care facility with counseling), plus five years' probation.

## 2. The Defense Case

### a. Defendant's Testimony

In September, defendant and Hill had had a huge argument over defendant's desire to go back to his former girlfriend, Brandi Blackburn. His relationship with Hill was "up in the air" in the week or two before Kesha's death. In the week before Kesha's death, defendant did not stay at the apartment at night. He would arrive at the apartment in the morning, take naps, and then come and go from there the rest of the day.

The night before Kesha's death, defendant had been with Blackburn all evening. He arrived at his apartment about 8:40 a.m., crawled into a sleeping bag, and Kesha joined him. They slept until about 11:00 a.m. Around noon, Hill borrowed defendant's car to run errands with Kelly Salay, and was gone approximately two and a half to three and a half hours. During that time, defendant was with Kesha, who was fine except for having some diarrhea, for which defendant showered her without incident. Hill came back about 3:45 or 4:00 p.m. Defendant started boiling some water in a pot, and then went outside to check the oil in his car. While he was outside, he heard Kesha scream. He went back into the house and saw Kesha lying bent over in front of the refrigerator. Hill, who was standing about a foot away from Kesha, was holding a pot containing water, oil, and butter. He pushed the pot away, picked up Kesha, and turned and ran to the counter sink. But it was filled with clothes that Hill had been washing. He slipped and fell into the high chair, but he did not fall on or drop Kesha, nor did he squeeze her hard. He carried her to the shower and turned one of the knobs on, without looking to see whether it was the hot or cold water knob. He went back to the kitchen and asked Hill what had happened, but she just said she had to clean up the mess. He returned to the bathroom, turned the shower off, and began taking Kesha out of the shower. Hill then took Kesha, and said she would take care of her. Hill applied some Neosporin, said that it was not as bad as it looked, and that everything was fine.

Hill dressed Kesha and asked defendant to go to the store to get juice and food for Kesha. Defendant first went to Salay's house, where he talked with Salay for about five minutes and then got into an argument with Salay's roommate's mother for about 30 to 45 minutes. Defendant then went to the store and bought the items. When he returned home, he found Kesha lying on a pillow, not crying or making any noise. He brought her the juice and she sat up and drank it. She fell asleep on his chest. He awoke when he felt her arm drop down by his side. Her body had gone limp. Hill attempted to revive Kesha by placing her in the kitchen sink. Defendant tried CPR and told Hill to call 911. Later, when the police arrived and asked defendant what had happened, he told them he had burned Kesha in the shower.

Defendant denied ever having struck Kesha in a violent way the day she died. He occasionally swatted her on the hand or on the buttocks, but he mainly disciplined her by using his loud voice.

Defendant acknowledged writing in the October 22, 1995 letter that he sent to Hill in jail that "I wish I'd told you the truth and that we would have taken her in to be checked, she'd be alive" and "I believe telling you it was water and not butter you wouldn't think the burns were that bad." Defendant stated he wrote the letter to let Hill know that he was going to take the blame for Kesha's death. He stated that his earlier inconsistent statements, such as telling Salay and the people at the market that Kesha had been burned in the shower, were his attempt to take the blame for Kesha's burns. Defendant also took the blame by adopting the police investigator's suggestion that defendant had burned Kesha with the pan he used to fry the shrimp. He decided to take the blame because he knew that Hill could not physically or mentally handle being in prison, but he could.

Defendant further stated he decided to take the blame because, at the time of Kesha's death, he thought it was an accident. He did not know anything about the abuse. Defendant decided to stop taking the blame after Hill showed no remorse, and he ended up in solitary confinement.

Defendant denied ever kicking or punching S. or J., the children he had with Robertson. In December 1987, defendant was living with his sister-in-law and his niece Kayla, who was four months old. Defendant took Kayla to the emergency room for a broken leg, and said that it happened when 17-month-old J. grabbed Kayla while she was sitting on defendant's lap and she fell. Defendant was arrested for assault after he became furious with child protective services workers when they asked him questions at the hospital about Kayla's injury. A few months later, Kayla got some wood glue in her mouth, but defendant thought that there was no reason to go to the emergency room. Rather, he followed the directions on the back of the glue bottle and washed her mouth out with water.

Defendant stipulated that in 1989 he was convicted of the felony of shooting at an inhabited dwelling.

### b. *Defendant's Admissions to Kenneth Long*

Kenneth Long, a felon with convictions for assault with a deadly weapon and possession of methamphetamine, was a longtime friend of defendant's who testified for the defense about Hill's supervision of Kesha. On cross-examination, Long testified to a conversation he had with defendant, who phoned Long from prison after Kesha's death. Defendant told Long that

Kesha had startled defendant by grabbing his leg while he was cooking with a skillet. He knocked the skillet off the stove, which fell on Kesha and burned her with oil. He picked her up and ran towards the shower, stumbled over the high chair, and fell on her.

### c. *Defendant's Expert Witness*

Pathologist Dr. Sharon Van Meter reviewed the autopsy report, photographs, and other medical records. She believed the burns were caused by a "quite hot" liquid, which possibly might have been slightly thicker than water, but she could not unequivocally rule out water. Based on the appearance of the burns, she could not reach a conclusion whether the burns were caused accidentally or intentionally. She believed the burns were caused by one spattering or splashing event, although she could not unequivocally rule out multiple events.

Dr. Van Meter agreed that Kesha had been abused. She believed that Kesha's internal injuries were "blunt-force types of injuries," but she could not form an opinion as to what specific object caused them.

### d. *Defendant's Behavior Towards Kesha and Other Children*

The defense presented several witnesses who testified they had never seen defendant strike Kesha, or any other child, in their presence:

### (1) *Jo Ann Goularte*

Jo Ann Goularte got to know defendant well in late 1994 or early 1995, when he and his second wife, Jennifer, then pregnant, moved into a cabin on the Goularte property, after he got out of prison. Defendant took care of the newborn baby, and his older children would visit him. She never saw him show anger or act violently towards any of the children.

### (2) *The Green Family*

Tamara Green allowed defendant, Hill, and Kesha to stay at her house for a few weeks in April 1995, while defendant was waiting for an apartment to become available. Green described defendant's interaction with Kesha as "fatherly" and "very loving." She thought his expectations for Kesha were "too high for a child of that age," but she never saw him spank her or be violent towards her. After defendant and Hill moved to a nearby apartment, Green and her two daughters, Holly, age 11, and Jennifer, age 10, continued to socialize with them. Holly could only recall one instance in which defendant

hit Kesha, which was when she tried to eat bath oil and he "smacked" her on the hand. Jennifer never saw defendant hit or spank Kesha with any force. The only instance she could recall was when he lightly slapped Kesha's hand to stop her from playing with cigarettes.

### e. *Hill's Parenting and Treatment of Kesha*

Kenneth Long testified about Hill's supervision of Kesha. On one occasion, Kesha fell on her face and Hill ignored it. Another time, she appeared out of touch with reality because she started screaming at a garbage can for no apparent reason. Long's mother, Mary Paige, testified that Hill would sometimes "space out," and that Hill was not aware or did not care that Kesha was crying.

Marlene Cisneros hired Hill to babysit for her on several occasions, and Hill sometimes brought Kesha along. On one occasion in late September, Cisneros saw that Kesha looked very pale and had a fever. Cisneros asked Hill whether she wanted to take Kesha to the emergency room. Hill initially refused, saying that she was scared to do so because Kesha had bruises on her, but Hill finally agreed to have Cisneros drive them to the hospital.

### f. *Kesha's Health Problems*

According to Tamara Green, Kesha was sick most of the time that she saw her in 1995, and exhibited coughing, diarrhea, and vomiting. In late August or early September, Green became concerned because she saw a bruise or raised welt on Kesha's left thigh that was not healing. Kesha was clumsy when she lived at Green's house, and often fell down.

### g. *Shooting Incident Involving D. Robertson*

Judith Mooney testified concerning the credibility of prosecution witness D. Robertson. Mooney disputed Robertson's account of the incident underlying Robertson's misdemeanor conviction for negligently firing a firearm. Mooney testified that Robertson had in fact fired three times at Mooney and her children, after Mooney had gone to Robertson's house and Robertson had asked her to leave.

## B. *Penalty Phase Evidence*

### 1. *Aggravating Evidence*

#### a. *Kayla's Broken Leg*

The prosecutor introduced evidence that defendant had abused his niece, Kayla, who, on December 13, 1987, when she was four months old, was

taken to an emergency room for a broken leg. When police interviewed defendant about the injury, he stated he had been holding Kayla on his lap, when his 17-month-old son grabbed Kayla, causing her to fall onto an open drawer, and then the son fell on top of her. Emergency room physician Dr. Mark Shallit treated Kayla. In his opinion, Kayla's injury was the result of abuse because the femur was broken in a spiral fracture, which indicates a strong twisting force was applied. Dr. Shallit did not think that the injury could have been caused in the way defendant described. The Fresno Sheriff's Department placed a hold on Kayla because of concerns of possible child abuse. After being notified by the hospital, child protective services conducted an investigation, but its investigator, Robert Sandoval, concluded the injury was probably an accident. Dr Shallit believed the child protective services investigator was mistaken in his conclusion.

### b. *Home Shootings*

The prosecutor introduced evidence concerning the incidents that led to defendant's 1989 conviction for shooting at an inhabited dwelling (to which he had stipulated during the guilt phase). Willard Eugene Wages, who had known defendant all his life, testified that on May 10, 1989, about 8:30 p.m., he was sitting in his living room with his two young daughters, when someone shot at him through the back window of his house. A bullet, which police later recovered, struck the wall over the front door. In a separate incident, about 10:00 p.m. on the same evening, Joyce Bryce was contacted at work about a shooting at her home. Returning home, she discovered that her windows had been broken and that there were "about 13 [or] 14" bullet holes in the walls of her house.

In connection with the investigation, police obtained a warrant to search defendant's home, where they discovered a .45-caliber handgun and ammunition for the handgun and for an assault rifle. Defendant was arrested, and, after being told that police had recovered a .45-caliber projectile from the Wageses' residence, admitted he had shot at both residences. Four days later, he changed his story and stated that someone named Thompson committed the shooting at the Wageses' residence.

### 2. *Evidence in Mitigation*

### a. *Defendant's Social History*

Psychologists Robert Halon and Robert Owen presented the following social history based on conversations with defendant and his relatives, and through a review of records.

Defendant's mother, Yolanda, fled home at age 16 after being molested by her stepfather. She married 18-year-old Billy Joe Whisenhunt and had three

children with him in rapid succession: Butch, Jack, and defendant. Billy Joe Whisenhunt beat her on a regular basis, including when she was pregnant with defendant. She eventually left him.

Defendant was hyperactive as a child. His mother hated him because he looked just like his father, and she beat him frequently. She started telling him that he was "exactly like his worthless, abusive, violent, explosive father." Defendant began to steal at age five and, by the time he was 12 years old, his mother was unable to handle him. She called his father, who at this point was living in Idaho, and told him to come get defendant before she killed him. His father took custody of defendant, who did not see his mother again until he was 17 or 18 years old. Defendant's two brothers stayed with their mother.

Defendant's father moved around frequently, taking defendant to several states, including Idaho, Oregon, and Missouri. Defendant's father abused him and, after about a year, when defendant was 13 years old, abandoned him to a social services agency in Missouri. This followed an incident in which defendant's father severely beat him after discovering that defendant had stolen two checks from a car dealership. Defendant became a ward of the court and was continually moved from one care facility to the next. Defendant was placed with several foster families, but eventually each sent him away or was unable to keep him. When defendant was 17 years old, the social services agency had run out of places to send him and petitioned the court to terminate its supervision of him. Defendant was given a bus ticket to California and sent out on his own.

Dr. Halon testified that defendant had very few attachment patterns with other human beings during his childhood, and this was exacerbated in his teenage years because he was shuffled from one temporary home to another. Dr. Halon testified that, because defendant did not feel loved and did not have any strong social attachments, he did not develop a sense of morality. Dr. Halon was of the opinion that defendant viewed children who received love and affection from their parents as a threat because they got something he never could. Dr. Owen expressed similar conclusions in his testimony, and stressed the negative impact of the rejection and abandonment by defendant's mother and father. Dr. Owen stated that defendant was neither psychotic nor suffering from a major mental illness.

b. *Kayla's Broken Leg*

Robert Sandoval, a social worker for child protective services, testified about his investigation of defendant's possible abuse of Kayla in connection with her broken leg (of which the prosecution had presented penalty phase

evidence). The reports Sandoval prepared at the time indicated that he went to the hospital and spoke to the floor nurse, but not the treating physician or any other doctor. He also went to Kayla's home to view the bedroom. After an informal hearing, child protective services decided the allegations of physical abuse were unfounded. On cross-examination, Sandoval stated that, at the time he conducted his investigation, he did not have the information that a spiral fracture (such as Kayla had suffered) requires twisting in addition to the force that breaks the bone. He stated that such information would have been important for him to have had at the time of his investigation.

c. *Defendant's Prospects as a Life Prisoner*

James Park, a former administrator in the California Department of Corrections, testified about defendant's prospects if he were to be sentenced to life without possibility of parole, and were housed at a Level IV prison. Park was provided with a transcript of defendant's preliminary hearing and a copy of defendant's prior prison records. Based on this information, Park opined that defendant would make a good adjustment to prison, that he would perform useful work if given the opportunity, and that he would not pose a danger to prison staff or other prisoners.

## II. DISCUSSION

A. *Jury Selection Issues*

1. *Defense Request to Show Photographs of the Victim's Injuries During Voir Dire*

Defendant contends the trial court erred in denying his request to show prospective jurors the photographs of Kesha's injuries as part of the defense's voir dire, and thereby violated his rights to a reliable verdict, to trial by jury, and to due process, under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and corresponding provisions of the California Constitution.[2] As we explain, we conclude the trial court did not err in denying his request.

---

[2] Regarding this claim and other claims raised on appeal, defendant contends the asserted error or misconduct violated several constitutional rights. In many instances in which defendant raised issues at trial, however, he failed to explicitly make some or all of the constitutional arguments he now asserts on appeal. Unless otherwise indicated, his appellate claims either required no action by defendant to preserve them, or involved application of the same facts or legal standards defendant asked the trial court to apply, accompanied by a new argument that the trial error or misconduct had the additional *legal consequence* of violating the federal Constitution. To that extent, defendant has not forfeited his new constitutional claims on appeal. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1084, fn. 4 [40 Cal.Rptr.3d 118, 129 P.3d 321].) On the merits, no separate constitutional discussion is required, or provided, where rejection of a claim that the trial court erred on the issue presented to that court necessarily

Through an in limine motion, defense counsel sought to exclude from the guilt phase photographs of Kesha's injuries. The trial court ruled that such photographs were admissible and that it would permit the prosecution to use several of them, while excluding several as cumulative.[3] Defense counsel then moved to allow the defense to show prospective jurors the photographs during voir dire. Defense counsel argued the photographs were so prejudicial that the defense could not determine whether prospective jurors could be fair unless it showed them the actual photographs and asked them whether they could render a fair and impartial decision at the penalty phase after having seen the photographs. The prosecution opposed the motion, arguing it was unsupported by case law and, in essence, sought to have the jurors prejudge the evidence. The trial court denied the motion, but added it would allow counsel to question prospective jurors about the photographs, as long as there was no use of actual items of evidence. The court also stated it would personally voir dire prospective jurors to determine what effect the photographs might have on them.

During voir dire, the trial court asked the prospective jurors if they would have "difficulty in deciding a case that involve[d] some graphic photographs showing serious injuries." Two prospective jurors responded affirmatively, and the court excused both for cause. Subsequently, defense counsel asked the prospective jurors whether seeing "graphic or gruesome photographs" of a deceased child would cause them to presume that defendant was guilty or would cause them to feel that somebody should pay for the crime, regardless of the rest of the evidence in the case. None of the remaining jurors indicated they would be so affected.

■ We defer to the trial court's discretion regarding the manner of conducting voir dire. (*People v. Navarette* (2003) 30 Cal.4th 458, 490 [133 Cal.Rptr.2d 89, 66 P.3d 1182]; *People v. Waidla* (2000) 22 Cal.4th 690, 713–714 [94 Cal.Rptr.2d 396, 996 P.2d 46].) As we have stated, death-qualification voir dire must avoid two extremes: on the one hand, it must not be so abstract that it fails to identify those jurors whose death penalty views would prevent or substantially impair the performance of their duties; on the other hand, it must not be so specific that it requires the prospective jurors to prejudge the penalty. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 47 [17 Cal.Rptr.3d 710, 96 P.3d 30].) " 'In deciding where to strike the balance in a particular case, trial courts have considerable discretion.' " (*Ibid.*) Here, the trial court expressly asked prospective jurors about the photographs, and defense counsel also made specific inquiries on the subject. Defendant

leads to rejection of any constitutional theory or "gloss" raised for the first time here. (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581].)

[3] Defendant argues as separate claims (see *post*, at pp. 211–212, 223–224), that the trial court erred in admitting these photographs at the guilt and penalty phases.

presents no authority for the proposition that the trial court was required to allow the defense to show prospective jurors the actual photographs in connection with its questioning and, on this record, we see no abuse of discretion.

### 2. Witt *Error*

Defendant contends the trial court erred in excusing Prospective Juror K.K. based on her views concerning the death penalty, and in failing to ask followup questions before dismissing her. As we explain, we conclude the trial court did not err in dismissing this prospective juror.

#### a. *Background*

In her written juror questionnaire, K.K. twice stated that she was "strongly" opposed to the death penalty. She indicated she believed the death penalty was "too often" imposed and wrote: "I don't feel the death penalty should be imposed at all." In response to whether she had any moral or philosophical views that would affect her ability to impose either death or life without the possibility of parole, she wrote, "It would be extremely difficult for me to vote to impose the death penalty." In response to a question asking whether her views on the death penalty would cause her to refuse to find a defendant guilty of first degree murder in order to prevent the penalty phase from taking place, she wrote that, while she was "morally and philosophically against the death penalty," she "could never vote 'not guilty' if [she] had no doubt of the defendant's guilt." She also indicated she would not vote against a special circumstance allegation that had been proven beyond a reasonable doubt, just to prevent a penalty phase. In response to a question asking whether her views on the death penalty would cause her to vote automatically for life in prison without considering the penalty phase evidence, she wrote, "I hope I don't have to face this question. It is not possible for me to automatically vote in any direction. This would be very, very tough for me, however." On the last question, whether she could set aside her own personal feelings regarding what the law ought to be and follow the law as the court explained it to her, she wrote "yes."

During voir dire, K.K. stated that she was "strongly against" the death penalty, but she also stated she felt she could decide the guilt phase based on the facts and law in the case without regard to penalty or punishment. In response to the question whether she could vote for death in the penalty phase, she stated she could not vote for the death penalty "under any circumstances." The prosecutor challenged her for cause. In response, defense counsel requested that the court ask her if she could, in fact, impose the death penalty as directed by the court and as directed by the oath she had taken.

The court asked her whether she would be able to consider and vote for the death penalty as an alternative to life in prison without the possibility of parole, and she replied, "I could not vote for the death penalty." There was no objection or any further request for elaboration from defense counsel, and the trial court excused K.K. for cause.

### b. *Analysis*

■ The federal constitutional standard for dismissing a prospective juror for cause based on his or her views of capital punishment is, " '[W]hether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Uttecht v. Brown* (2007) 551 U.S. 1, 35 [167 L.Ed.2d 1014, 127 S.Ct. 2218, 2223], citing *Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844].) Applying *Witt*, we have stated: " ' " 'A prospective juror is properly excluded if he or she is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate.' [Citation.]" In addition, " '[o]n appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous.' [Citations.]" ' " (*People v. Blair* (2005) 36 Cal.4th 686, 743 [31 Cal.Rptr.3d 485, 115 P.3d 1145], quoting *People v. Jenkins* (2000) 22 Cal.4th 900, 987 [95 Cal.Rptr.2d 377, 997 P.2d 1044].)

Defendant contends the trial court erroneously excused K.K. for cause, claiming (1) the record does not support the trial court's determination that she held views that would prevent or substantially impair her ability to perform her duties as a juror, and (2) the trial court failed to make sufficient inquiries to establish whether she held such views. We conclude K.K.'s answers to the written questionnaire and during voir dire support the trial court's ruling. As noted, K.K. indicated in her questionnaire answers that she was "strongly" opposed to the death penalty, that she did not think the death penalty should be imposed at all, and that she was morally and philosophically against the death penalty. During voir dire, she stated she could not vote for the death penalty "under any circumstances." When, at defense counsel's request, the trial court further questioned her, she again unequivocally stated she "could not vote for the death penalty." The record therefore fairly supports the trial court's determination of her true state of mind.

Because we conclude the record supports the trial court's ruling, we also reject defendant's contention that the trial court should have questioned the juror further before dismissing her. In essence, defendant contends the trial court failed to ask the "appropriate" followup question, and implies that the

trial court erred by failing to ask the exact question as suggested by defense counsel (namely, could she impose the death penalty as directed by the court and as directed by the oath she had taken?). But defendant provides no authority that the trial court was obliged to so state the question. The question the trial court did ask K.K. (would she be able to consider and vote for the death penalty as an alternative to life in prison without the possibility of parole?) addressed defense counsel's request for additional inquiry into her views and elicited an answer that supported the trial court's exclusion of the juror.

### B. *Guilt Phase Issues*

#### 1. *Sufficiency of the Evidence to Support the First Degree Murder Conviction and Torture Special Circumstance Finding*

Defendant contends insufficient evidence supported the jury's first degree murder conviction and torture special circumstance finding. As we explain, we conclude that substantial evidence supported the jury's findings.

At the close of the prosecution's case-in-chief, the defense filed a motion for a judgment of acquittal pursuant to section 1118.1, which the trial court denied. Defendant challenges the sufficiency of the evidence in connection with the trial court's denial of his section 1118.1 motion. The standard applied by the trial court under section 1118.1 in ruling on a motion for judgment of acquittal is the same as the standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction. (*People v. Mincey* (1992) 2 Cal.4th 408, 432, fn. 2 [6 Cal.Rptr.2d 822, 827 P.2d 388].) "In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we 'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] '[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.] We do not reweigh evidence or reevaluate a witness's credibility. [Citation.]" (*People v. Guerra, supra,* 37 Cal.4th at p. 1129.)

The prosecution offered two theories of first degree murder: premeditated and deliberate murder, and murder by torture. Defendant challenges the

sufficiency of the evidence that defendant entertained the requisite mental state for either theory of first degree murder. In particular, defendant contends that, under *People v. Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942], there was insufficient evidence of premeditation and deliberation for either theory.

■ For a killing with malice aforethought to be first rather than second degree murder, the intent to kill must be formed upon a preexisting reflection and have been the subject of actual deliberation or forethought. (*People v. Anderson, supra*, 70 Cal.2d at p. 26.) In contrast, murder by means of torture, a statutorily listed type of first degree murder (§ 189), does not require an intent to kill, but requires the intent to torture, and requires the same proof of deliberation and premeditation as is required of other kinds of first degree murders. (*People v. Steger* (1976) 16 Cal.3d 539, 546 [128 Cal.Rptr. 161, 546 P.2d 665].) "The elements of torture murder are: (1) acts causing death that involve a high degree of probability of the victim's death; and (2) a willful, deliberate, and premeditated intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose. [Citations.]" (*People v. Cook* (2006) 39 Cal.4th 566, 602 [47 Cal.Rptr.3d 22, 139 P.3d 492].) As discussed below, the evidence produced at trial provides sufficient evidence of both theories of first degree murder argued by the prosecutor.

■ The evidence of Kesha's wounds support first degree murder by torture. The evidence indicates that she was brutally kicked or punched, and that, after she was incapacitated, the perpetrator methodically poured hot cooking oil onto various portions of her body, repositioning her body so as to inflict numerous burns throughout her body, including her genital region. As we have stated, the jury may infer the required mental state for murder by torture from the condition of the victim's body. (*People v. Mincey, supra*, 2 Cal.4th at p. 433.) Here the condition of the body, with the numerous methodical burn wounds inflicted, abundantly supports the jury's finding that defendant had the willful, deliberate, and premeditated intent to cause extreme pain or suffering for a sadistic purpose.

The methodical infliction of the burn wounds also supports first degree murder on a theory of premeditated and deliberate intent to kill, especially in combination with the other evidence presented at trial indicating defendant's intent to kill Kesha. Evidence of Kesha's injuries in the period prior to the murder indicated that defendant continually abused her. As the prosecutor argued, defendant's continuing and escalating acts of abuse showed his

premeditated and deliberate intent to eventually kill her.[4] Furthermore, on the day of the murder, defendant took deliberate advantage of Hill's absence, and the fact that Kesha was alone with him, to inflict his most extreme abuse in the form of the blows and burning oil torture that caused her death. Evidence of defendant's actions after he inflicted the fatal wounds also supports the inference that he deliberately intended to kill Kesha. When Hill returned home to find her daughter grievously injured, defendant initially dissuaded Hill from seeking medical help by lying to her about the nature and extent of Kesha's injuries, and then actively prevented her from calling 911 until after Kesha died.

■ Defendant contends our discussion in *People v. Anderson, supra,* 70 Cal.2d at pages 26 through 27, indicates there was insufficient evidence to support a showing of premeditation and deliberation under either theory of first degree murder. We disagree. As we have observed, the *Anderson* factors are simply an aid for the reviewing court, and an "[u]nreflective reliance" on *People v. Anderson* is inappropriate. (*People v. Thomas* (1992) 2 Cal.4th 489, 517 [7 Cal.Rptr.2d 199, 828 P.2d 101].) Defendant contends that, because the child abuse inflicted by defendant appears senseless and inexplicable, there is insufficient evidence to support first degree premeditated murder. But the lack of a discernable rational motive does not preclude a conviction for first degree premeditated murder. (See *People v. Edwards* (1991) 54 Cal.3d 787, 814 [1 Cal.Rptr.2d 696, 819 P.2d 436].) We previously have upheld the sufficiency of a first degree murder conviction in the context of child abuse and torture. (*People v. Mincey, supra,* 2 Cal.4th at pp. 432–436.) As discussed above, the evidence in this case likewise supports the jury's finding of first degree murder.

■ Finally, we conclude sufficient evidence supported the jury's true finding on the torture-murder special-circumstance allegation. The special circumstance requires that a murder be "intentional and involve[] the infliction of torture." (§ 190.2, subd. (a)(18); see *People v. Elliot* (2005) 37 Cal.4th 453, 479 [35 Cal.Rptr.3d 759, 122 P.3d 968] ["the requisite torturous intent is an intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any other sadistic purpose"].) As the

---

[4] Defendant cites an out-of-state case (*Midgett v. State* (1987) 292 Ark. 278 [729 S.W.2d 410] [superseded by statute]) to support his contention that defendant's continuing abuse of Kesha supports the opposite inference, namely, that defendant did not intend to kill her but rather intended to keep her alive for further abuse. But even assuming for the sake of argument that a reasonable jury *could* have drawn this inference from the child abuse evidence, defendant has not shown insufficiency of the evidence. If the circumstances reasonably justify the jury's findings, the reviewing court may not reverse the judgment merely because it believes the circumstances might also support a contrary finding. (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139 [17 Cal.Rptr.2d 375, 847 P.2d 55].)

above analysis shows, the evidence supports the jury's conclusion that the murder both was intentional and involved the infliction of torture.

### 2. *Admission of Prior Acts of Child Abuse*

Defendant contends the trial court erroneously admitted evidence of his prior acts of physical abuse against children, in violation of Evidence Code sections 1101, subdivision (b), and 352. As we explain, we conclude that the evidence was properly admitted.

#### a. *Background*

Through an in limine motion, the prosecutor sought the admission of testimony from defendant's ex-girlfriend, D. Robertson, that defendant had kicked and hit his two children from that relationship, S. and J., when they were young. Defense counsel objected that the evidence was irrelevant and inadmissible under Evidence Code sections 1101 and 352. The trial court tentatively ruled the evidence involving S. and J. was admissible to show intent, motive, and absence of accident, and that the probative value of the evidence outweighed any prejudicial effect. Later, at trial, in a sidebar conference during Robertson's testimony, the prosecutor stated he was seeking admission of the evidence in order to show intent and absence of accident, but not motive. The trial court so instructed the jury immediately before Robertson's testimony. As summarized above, Robertson testified defendant hit and kicked S. and J. when they were one and three years old, respectively.

#### b. *Analysis*

Evidence Code section 1101, subdivision (b), permits the admission of other-crimes evidence against a defendant "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." (See *People v. Catlin* (2001) 26 Cal.4th 81, 145 [109 Cal.Rptr.2d 31, 26 P.3d 357].) "Section 1101 prohibits the admission of other-crimes evidence for the purpose of showing the defendant's bad character or criminal propensity." (*Ibid.*) As with other circumstantial evidence, its admissibility depends on the materiality of the fact sought to be proved, the tendency of the prior crime to prove the material fact, and the existence or absence of some other rule requiring exclusion. (*People v. Roldan* (2005) 35 Cal.4th 646, 705 [27 Cal.Rptr.3d 360, 110 P.3d 289].) "On appeal, the trial court's determination of this issue, being essentially a determination of relevance, is reviewed for abuse of discretion." (*People v. Kipp* (1998) 18 Cal.4th 349, 369 [75 Cal.Rptr.2d 716, 956 P.2d 1169].)

As noted, the trial court admitted defendant's prior acts of child abuse to show intent and absence of accident. Treating intent and absence of accident

as distinct and separate bases for admissibility, defendant first contends that evidence of his intent in his prior acts of child abuse was irrelevant to any element of intent required for the charged crimes of first degree premeditated murder and first degree murder by torture. Defendant contends that the evidence he kicked and hit his two children showed neither premeditation, intent to kill, nor intent to torture. But the trial court's use of "intent" and "absence of accident" merely reflects two ways of describing the same relevant issue, namely, that defendant performed the acts that killed Kesha intentionally rather than accidentally. The prosecution's burden of proving all the elements of the charged offenses included the threshold showing that the acts that caused Kesha's death were performed intentionally rather than accidentally, and defendant's prior acts of violence against other children were relevant to proving this.

As to absence of accident, defendant acknowledges that Evidence Code section 1101, subdivision (b), permits the admission of other-crimes evidence to show absence of accident, but he contends such evidence can only be admitted when a defendant has introduced accident as a defense. Defendant argues that he never offered an accident defense. Rather, he contends his defense was that Hill caused the fatal wounds, and that, even if his defense was that she might have done so accidentally, this did not amount to an accident defense for himself.

■ Defendant construes the purpose of absence of accident evidence too narrowly. Certainly, when a defendant admits committing an act but denies the necessary intent for the charged crime because of mistake or accident, other-crimes evidence is admissible to show absence of accident. (*People v. Robbins* (1988) 45 Cal.3d 867, 879 [248 Cal.Rptr. 172, 755 P.2d 355].) But we have never limited evidence of absence of accident to such instances. Rather, a defendant's plea of not guilty puts in issue all the elements of the charged offense. (*People v. Roldan, supra*, 35 Cal.4th at pp. 705–706; *People v. Balcom* (1994) 7 Cal.4th 414, 422–423 [27 Cal.Rptr.2d 666, 867 P.2d 777].) Furthermore, defendant declined to stipulate that Kesha's wounds were caused intentionally. (See *People v. Roldan, supra*, 35 Cal.4th at p. 706, fn. 24.) Indeed, defendant offered expert testimony to support the theory that Kesha's burns were caused accidentally. We also note that the defense opening statement raised the possibility that defendant accidentally caused Kesha's fatal internal injuries when he slipped and fell while carrying Kesha to the shower following the burns allegedly caused by Hill. This expressly placed the question of accident in issue for the prosecution's case-in-chief, notwithstanding that, when defendant ultimately testified, he denied falling with Kesha.

Finally, defendant contends that, even if the other-crimes evidence was admissible under Evidence Code section 1101, subdivision (b), the evidence

should have been excluded under Evidence Code section 352 because its probative value was substantially outweighed by the probability that it would cause undue prejudice. Defendant essentially contends that evidence of child abuse is intrinsically highly inflammatory. But, as discussed above, the evidence was probative of the issue of intent and absence of accident. The prior child abuse evidence was far less inflammatory than the evidence of Kesha's injuries, and this decreased the possibility that the jury's passions were inflamed by the evidence of defendant's uncharged child abuse. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 405 [27 Cal.Rptr.2d 646, 867 P.2d 757].) Defendant also contends the prior child abuse evidence should have been excluded because the events took place between seven and 10 years before the date of the charged murder. But, on this record, we cannot conclude that the passage of time significantly lessened the probative value of the evidence. (See, e.g., *ibid.*; *People v. Ing* (1967) 65 Cal.2d 603, 612 [55 Cal.Rptr. 902, 422 P.2d 590].) Therefore, we conclude the trial court did not abuse its discretion under Evidence Code sections 1101, subdivision (b), and 352.

### 3. Limitation of Impeachment of Prosecution Witness D. Robertson

Defendant contends the trial court erred in refusing to permit the defense to present significant evidence impeaching prosecution witness D. Robertson, which violated Evidence Code section 352. As we explain, we conclude the trial court did not abuse its discretion in limiting the impeachment evidence.

#### a. Background

As discussed in the immediately preceding part, prosecution witness Robertson testified to defendant's past acts of child abuse. On cross-examination, the trial court allowed defense counsel to impeach her credibility by eliciting testimony that she had (1) accused defendant of sexually abusing their daughter, even though the accusation did not result in criminal charges being filed against him; (2) failed to attend a court-ordered appointment for counseling in connection with those allegations; (3) failed to report to the police or seek medical attention for defendant's acts of abuse towards her children; and (4) been arrested in connection with a shooting incident in 1989.

The trial court, however, sustained the prosecutor's objections under Evidence Code section 352 to defense questioning about whether defendant had broken up with Robertson because he had caught her in bed with one of his friends, Dean Morgan. In the sidebar discussion about the objection, defense counsel argued Robertson's affair with Morgan was relevant because

it explained why defendant had left Robertson and therefore cleared up any misconception the jury might have formed that Robertson left defendant because he abused their children. The court agreed with defense counsel that evidence about who left whom first and for what reason was relevant, and the court allowed the defense to so inquire, but restricted defense counsel from going into detail about any affairs. In his cross-examination, defense counsel established that defendant left Robertson before she made her allegations that defendant was abusing the children. Defense counsel then asked her whether she and defendant had separated because she was having an affair with someone else, and she answered "no."

The trial court also sustained the prosecutor's relevance objections to certain defense questions connected to Robertson's 1989 shooting incident, namely (1) whether she was having an affair with a man named James Mooney in 1989; (2) whether she shot towards Mooney's wife, Judith Mooney, during the incident; (3) whether she lied to the police and her probation officer about the shooting incident; and (4) whether, when the police investigated the shooting incident, she agreed to come out of her house only after a SWAT team arrived.

On redirect examination, the prosecutor established that Robertson was convicted of a misdemeanor for the 1989 shooting incident. On recross examination, Robertson stated she fired two shots from a .270-caliber deer rifle at a location near Judith Mooney's car while Judith Mooney's children were in the car, but she denied shooting at Judith Mooney. The trial court sustained the prosecutor's relevance objection when defense counsel asked her whether her case was originally charged as a felony.

Later, when Judith Mooney was scheduled to testify as part of the defense case, the prosecutor objected on Evidence Code 352 grounds to any testimony by Judith Mooney concerning the details of the 1989 shooting incident, which, as Robertson already admitted, had resulted in a misdemeanor conviction against her. Defense counsel opposed the restriction. He argued that Robertson had lied both at the time of the shooting and on the witness stand, and he contended that the defense was entitled to impeach her credibility by calling both Judith Mooney and a police officer named Fontecchio to testify about the incident. Defense counsel made an offer of proof that Judith Mooney would testify that, when she went to Robertson's residence, Robertson fired shots directly at Mooney and her seven-year-old child while they were both in their car, and that Robertson pointed the weapon at Mooney's child. Defense counsel said that Officer Fontecchio would testify that he responded to the scene and found three shell casings, that one bullet had struck the ground close to Mooney's car, and that Robertson told him that she shot into the air rather than at anyone in particular.

The trial court ruled that Mooney's testimony would be more probative than prejudicial but also stated that, while it would permit Mooney to briefly recite the facts of the shooting incident, it would not allow a detailed examination of the subject. As to Officer Fontecchio, the court found that the probative value of his testimony was outweighed by the risks of consuming undue time, and confusing the jury and the issues to be decided. It therefore sustained the prosecutor's objections to his testimony. As summarized above, Judith Mooney testified that in 1989, Robertson fired three shots from a rifle at Mooney and her children when Mooney went to Robertson's house to talk to her.

### b. *Analysis*

■ A trial court may restrict defense cross-examination of an adverse witness on the grounds stated in Evidence Code section 352. (*People v. Quartermain* (1997) 16 Cal.4th 600, 623 [66 Cal.Rptr.2d 609, 941 P.2d 788].) Defendant, however, contends the trial court abused its discretion by excluding testimony concerning Robertson's alleged affairs and Officer Fontecchio's testimony on the 1989 shooting incident. We conclude the trial court did not abuse its discretion by excluding both areas of testimony. (*People v. Chatman* (2006) 38 Cal.4th 344, 372 [42 Cal.Rptr.3d 621, 133 P.3d 534].)

As to the evidence of Robertson's alleged affair with Dean Morgan, the trial court allowed defense counsel to cross-examine Robertson about defendant's motive for leaving her, namely, that it was because of an alleged affair on her part (which she denied). The trial court's ruling allowed the defense to explore the issues relevant to the breakup of defendant and Robertson while properly excluding the irrelevant inquiry into the specifics of her alleged affair with Morgan. Similarly, the trial court properly excluded questioning about Robertson's alleged affair with James Mooney. The relevance of defense counsel's inquiry into the 1989 shooting incident with Judith Mooney was to impeach Robertson for moral turpitude on the basis of a criminal act, which was the shooting, not her alleged affair with James Mooney. Robertson's alleged affair with James Mooney might have revealed the source of the animosity between Robertson and Judith Mooney that may have led to the shooting. But this was a collateral issue properly excluded by the trial court.

The court also properly excluded the testimony of Officer Fontecchio. The court allowed Judith Mooney to testify about the shooting incident in connection with the limited issue of Robertson's credibility. As the court noted, what was relevant was a brief recitation by Mooney of the facts of the conduct involved, not a detailed examination or a retrial of the shooting incident. The testimony of Officer Fontecchio would have resulted in precisely such a retrial of a prior offense that Robertson had already admitted.

Furthermore "[a] trial court's limitation on cross-examination pertaining to the credibility of a witness does not violate the confrontation clause unless a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted." (*People v. Quartermain, supra*, 16 Cal.4th at pp. 623–624.) Here, the additional impeachment value of the excluded evidence was minimal in relation to the major areas of impeachment already raised by the admitted evidence, and a reasonable jury would not have received a significantly different impression of Robertson's credibility even if the excluded evidence had been admitted.

### 4. *Admission of Evidence of Victim's Prior Injuries*

Defendant contends the trial court erroneously admitted evidence of his prior acts of physical abuse against Kesha, in violation of Evidence Code sections 1101, subdivision (b), and 352. As we explain, we conclude the evidence was properly admitted.

#### a. *Background*

Through an in limine motion, the prosecutor sought the admission of evidence of injuries Kesha suffered in the months before she was killed. The prosecutor stated he was filing his motion in response to the trial court's order that the prosecution reveal all evidence proffered under Evidence Code section 1101, subdivision (b). The prosecutor, however, contended that, although proffered evidence of defendant's acts of physical abuse towards children other than the murder victim (i.e., defendant's biological children, S. and J.) implicated Evidence Code section 1101, subdivision (b), evidence of past injuries to the murder victim did not. Rather, citing *People v. Aeschlimann* (1972) 28 Cal.App.3d 460 [104 Cal.Rptr. 689], the prosecutor contended that evidence of past injuries to the murder victim was independently admissible as part of the res gestae of the murder by torture charge. The defense objected to the admission of evidence of Kesha's past injuries on the ground that there was no evidence defendant had inflicted the injuries, and that they were too remote in time to be relevant. The trial court ruled the evidence was admissible under both Evidence Code section 352 and section 1101, subdivision (b).

#### b. *Analysis*

Defendant contends the evidence of Kesha's past injuries was not admissible under either of the two theories raised below: (1) to show intent or absence of accident under Evidence Code section 1101, subdivision (b), or (2) as part of the res gestae of the crime of murder by torture. In arguing

against the admissibility of this evidence under Evidence Code section 1101, subdivision (b), defendant makes the same contentions he made in arguing against the admissibility of evidence of defendant's past acts of physical abuse against his biological children, discussed above. (See *ante*, at pp. 203–205.) He contends the evidence of Kesha's prior injuries did not show an intent to torture or kill, and that such evidence therefore was not admissible to show absence of accident, because defendant did not offer an accident defense. For the same reasons stated above, we reject defendant's contentions and conclude the trial court properly admitted the evidence under Evidence Code section 1101, subdivision (b). Defendant's prior acts of violence against the victim are indisputably relevant to showing intention and absence of accident. (See *People v. Zack* (1986) 184 Cal.App.3d 409, 415 [229 Cal.Rptr. 317].) Finally, we need not, and therefore do not, reach the prosecutor's alternate argument that the evidence was also admissible as part of the res gestae of the crime of torture murder.

### 5. *Cross-examination of Defendant on Past Acts of Child Abuse*

Defendant contends the trial court erroneously permitted the prosecution to cross-examine defendant about his acts of child abuse against his niece, Kayla, in violation of Evidence Code section 352. As we explain, we conclude the trial court did not abuse its discretion in permitting the cross-examination.

#### a. *Background*

During in limine motions, the prosecution sought the admission of several prior acts of child abuse committed by defendant, including two separate incidents involving defendant's niece, Kayla, in which he had intentionally broken her leg and put glue in her mouth. Defense counsel opposed the admission of any evidence of defendant's past acts of child abuse, including the incidents involving Kayla. The trial court tentatively ruled that all the proffered incidents of child abuse were admissible except the glue incident, which the court ruled was more prejudicial than probative under Evidence Code section 352. Notwithstanding the trial court's ruling, the prosecution did not call any witness during its guilt phase case-in-chief to testify about the incident involving Kayla's broken leg.

Later, as part of his guilt phase defense, defendant testified on his own behalf and stated that he was a "barker," who disciplined children with his loud voice rather than with physical violence. During cross-examination, the prosecutor sought to refute defendant's description of himself as nonviolent by questioning him about his acts of violence against his former wives and girlfriends, including his ex-wife Dorina, who was the mother of defendant's

niece, Kayla.[5] Defense counsel objected under Evidence Code section 1101 and on relevancy grounds to any questions concerning defendant's acts of violence against his former wives and girlfriends. The prosecutor argued for the admissibility of defendant's past acts of violence against women as refuting defendant's testimony, and also reminded the court of its ruling on the in limine motion allowing the use of evidence of Kayla's broken leg. The court sustained defense objections against questions about defendant's acts of violence against adult women, but ruled that it would stand by its previous ruling on the in limine motion involving acts of child abuse and stated "if you have violence against children, I'll allow that in."

The prosecutor then questioned defendant about an incident 10 years earlier when he was left in charge of his four-month-old niece Kayla and her left femur was broken. As set forth above, defendant testified that Kayla broke her upper femur after she fell from his lap. Defendant became furious when child protective services workers asked him questions about the incident, and he was arrested for assault. The prosecutor then cross-examined defendant about the incident a few months later when Kayla, once again left in defendant's care, ended up with wood glue in her mouth. Defendant testified he did not think it was necessary to take her to the emergency room. Rather, as suggested on the glue bottle, he washed out her mouth with water.

### b. *Analysis*

Defendant contends the trial court abused its discretion under Evidence Code section 352 in allowing the prosecution to cross-examination defendant about the two incidents involving Kayla. As a preliminary matter, respondent contends defendant has forfeited this claim on appeal because the only Evidence Code section 352 objection defense counsel made to the cross-examination concerned questions about defendant's acts of violence against adult women (which was sustained); defense counsel, however, failed to object to the trial court's ruling as it pertained to the Kayla incidents, either during the sidebar conference or during the actual cross-examination itself. But the issue is preserved on appeal because, as summarized above, during in limine motions, defense counsel had objected to the admission of both Kayla incidents on Evidence Code section 352 grounds. The issue is preserved because (1) a specific legal ground for exclusion was advanced through an in limine motion and subsequently raised on appeal; (2) the in limine motion was directed to a particular, identifiable body of evidence; and (3) the in limine motion was made at a time, either before or during trial, when the trial judge could determine the evidentiary question in its appropriate context. (*People v. Morris* (1991) 53 Cal.3d 152, 190 [279 Cal.Rptr. 720, 807 P.2d 949], disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal.4th

---

[5] Dorina had previously been married to defendant's brother.

824, 830, fn. 1 [38 Cal.Rptr.2d 394, 889 P.2d 588].) Indeed, the trial court referenced its in limine ruling concerning child abuse at the cross-examination sidebar conference.

In any event, on the merits, both Kayla incidents were relevant to the cross-examination of defendant. Both incidents were probative of the issue of defendant's credibility, since he described himself as someone who would never administer violent physical discipline or abuse to a child, and both incidents involved possible acts of violent physical discipline or abuse to a child. Furthermore, as with the other instances of defendant's past acts of child abuse discussed above (see *ante*, at pp. 203–205), the probative value of neither incident was outweighed by the probability that it would create a substantial danger of undue prejudice.

### 6. *Admission of Photographs of the Victim*

Defendant contends that admitting photographs of Kesha's injuries was an abuse of the trial court's discretion under Evidence Code section 352. As we explain, we conclude the trial court properly admitted the photographs.

#### a. *Background*

As recounted above (see *ante*, at pp. 196–197), through an in limine motion, defense counsel sought to exclude the prosecution's evidence of photographs of Kesha's injuries. Defense counsel contended the prejudice created by the photographs outweighed their probative value because they were inflammatory, they were not relevant to any disputed material issue, and they were cumulative of other prosecution evidence. Finally, defense counsel urged that any photographs the court permitted should be black and white instead of color. In opposing the motion, the prosecutor emphasized that his burden in proving a torture-murder theory of first degree murder entailed showing that defendant committed the murder with the intent to cause cruel suffering and extreme pain, and contended that the photographs were particularly relevant to that issue. The trial court allowed the admission of 12 photographs, finding that their probative value outweighed their prejudicial effect. But it denied the admission of 13 other photographs on the grounds they were cumulative, and that their probative value was therefore outweighed by their prejudicial effect.

#### b. *Analysis*

 To determine whether there was an abuse of discretion, we address two factors: (1) whether the photographs were relevant, and (2) whether the trial court abused its discretion in finding that the probative value of each

photograph outweighed its prejudicial effect. (*People v. Hoyos* (2007) 41 Cal.4th 872, 908 [63 Cal.Rptr.3d 1, 162 P.3d 528].) " ' "The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect. [Citations.]" ' " (*Ibid.*) Here the photographs were clearly relevant to the determination of many disputed facts at the guilt phase, particularly the murder by torture theory. (Evid. Code, § 210.) We have examined the photographs and conclude they are not of such a nature as to overcome the jury's rationality. (*People v. Hoyos, supra,* 41 Cal.4th at p. 909; *People v. Gurule* (2002) 28 Cal.4th 557, 625 [123 Cal.Rptr.2d 345, 51 P.3d 224].)

### 7. *Refusal to Instruct on Accessory to a Felony*

Defendant contends the trial court erroneously refused to instruct on the offense of being an accessory after the fact to a felony. As we explain, we conclude the trial court did not err in refusing the instruction.

#### a. *Background*

Defense counsel asked the trial court to instruct the jury with CALJIC No. 6.40, which defines the offense of being an accessory after the fact to a felony, within the meaning of section 32.[6] Defense counsel based his request on defendant's testimony that Hill had caused Kesha's injuries, and that, in order to protect Hill, defendant had lied to police officers and others about the cause of the burns. The prosecutor opposed this request because he had not charged defendant with such a crime. The trial court ultimately refused the requested instruction because the evidence did not show that defendant had the intent required to be an accessory at the time he made the statements, and because the evidence on which he was relying was exculpatory. The court noted, however, that defense counsel was free to argue to the jury that the evidence at most showed that defendant was guilty of being an accessory— an uncharged offense—and that defendant should therefore be acquitted. Defense counsel did not present this argument in summation.

---

[6] CALJIC No. 6.40 states: "Every person who, after a felony has been committed, harbors, conceals or aids a principal in that felony, with the specific intent that the principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that the principal has committed that felony or has been charged with that felony or convicted thereof, is guilty of the crime of accessory to a felony in violation of Penal Code section 32. [¶] In order to prove this crime, each of the following elements must be proved: [¶] 1. A felony, namely _____, was committed; [¶] 2. Defendant harbored, concealed or aided a principal in that felony with the specific intent that the principal avoid or escape [arrest] [trial] [conviction or punishment]; and [¶] 3. Defendant did so with knowledge that the principal [committed the felony] [was charged with having committed the felony] [was convicted of having committed the felony]."

For this instruction and all other CALJIC instructions referenced in defendant's claims, the version used is the 5th edition (1988), unless otherwise specified.

b. *Analysis*

Defendant contends the trial court's refusal to instruct on being an accessory after the fact denied him a constitutionally adequate opportunity to present a defense because an accessory instruction was "part and parcel" of the defense theory of the case. We have previously rejected a similar contention. (*People v. Schmeck* (2005) 37 Cal.4th 240, 291–292 [33 Cal.Rptr.3d 397, 118 P.3d 451].) An accessory instruction was not essential to defendant's defense. Through defendant's testimony and defense counsel's closing argument, the jury was fully apprised of the defense theories that it was Hill rather than defendant who caused Kesha's fatal injuries and that defendant lied in order to protect Hill. (See *ibid.*)

8. *Accomplice Instructions*

The trial court did not instruct with CALJIC No. 3.19, which asks the jury to determine whether a specified witness is an accomplice and requires the defense to prove, by a preponderance of the evidence, that the witness was an accomplice in the charged crime.[7] Defendant contends the trial court's failure to instruct on CALJIC No. 3.19 denied him the benefit of state law requiring that a jury view an accomplice's testimony with caution and not convict a defendant unless such testimony is corroborated. As we explain, although the trial court erred by failing to instruct with CALJIC No. 3.19, the error was harmless.

a. *Background*

At the request of the defense, the trial court read to the jury several standard instructions regarding accomplice testimony, including CALJIC No. 3.10 (Accomplice—Defined), CALJIC No. 3.11 (1990 rev.) (Testimony of Accomplice Must Be Corroborated), CALJIC No. 3.12 (Sufficiency of Evidence to Corroborate an Accomplice), CALJIC No. 3.14 (Criminal Intent Necessary to Make One an Accomplice), and CALJIC No. 3.18 (Testimony of Accomplice to be Viewed with Distrust). But the court did not give CALJIC No. 3.19 (Burden to Prove Corroborating Witness Is an Accomplice).[8]

---

[7] CALJIC No. 3.19 states: "You must determine whether the witness _____ was an accomplice as I have defined that term. [¶] The defendant has the burden of proving by a preponderance of the evidence that _____ was an accomplice in the crime[s] charged against the defendant."

[8] The trial court appears to have omitted this instruction because one of the Use Notes for CALJIC No. 3.19 stated: "If this instruction is given, CALJIC No. 3.13 [One Accomplice May Not Corroborate Another] must also be given." Because the trial court believed that CALJIC No. 3.13 was inappropriate, it declined to give CALJIC No. 3.19 as well. After defendant's trial, this Use Note to CALJIC No. 3.19 was removed. (See 6th ed. 1996.)

b. *Analysis*

 Section 1111 prohibits conviction on the testimony of an accomplice unless the testimony is corroborated by other evidence tending to connect the defendant with the commission of the crime. (*People v. Hayes* (1999) 21 Cal.4th 1211, 1270 [91 Cal.Rptr.2d 211, 989 P.2d 645].) Section 1111 defines an accomplice "as one who is liable to prosecution for the identical offense charged against the defendant . . . ." (See *People v. Hayes, supra,* 21 Cal.4th at p. 1270.) "When the evidence at trial would warrant the jury in concluding that a witness was an accomplice of the defendant in the crime or crimes for which the defendant is on trial, the trial court must instruct the jury to determine if the witness was an accomplice. If the evidence establishes as a matter of law that the witness was an accomplice, the court must so instruct the jury, but whether a witness is an accomplice is a question of fact for the jury in all cases unless 'there is no dispute as to either the facts or the inferences to be drawn therefrom.' [Citation.]" (*Id.* at pp. 1270–1271.)

In the instant case, the trial court gave a series of accomplice instructions, including those prohibiting the use of uncorroborated accomplice testimony to convict defendant. The court, however, neither instructed the jury that it had to determine that Hill was an accomplice nor instructed that she was an accomplice as a matter of law. Because the court was required to do one or the other, it erred. (See *People v. Hayes, supra,* 21 Cal.4th at pp. 1270–1271.)

Instructional error is subject to harmless error review. (*People v. Flood* (1998) 18 Cal.4th 470, 490, 502–504 [76 Cal.Rptr.2d 180, 957 P.2d 869].) Because the omitted instruction is based on section 1111, the asserted error is one of state law, subject to the reasonable probability standard of harmless error under *People v. Watson* (1956) 46 Cal.2d 818, 836–837 [299 P.2d 243]. (See *People v. Rogers* (2006) 39 Cal.4th 826, 875 [48 Cal.Rptr.3d 1, 141 P.3d 135].) Defendant contends the failure to give CALJIC No. 3.19 made the other accomplice testimony instructions pointless and entirely removed the accomplice issue from the case. We disagree. This is not a case in which all accomplice testimony instructions were omitted. The trial court extensively instructed the jury on how to treat accomplice testimony, but failed to give the instruction, CALJIC No. 3.19, that would have made it explicit that Hill was the accomplice witness for whom the accomplice testimony instructions applied. In essence, defendant's claim is that the one missing instruction made the application of the other accomplice instructions unclear to the jury. When reviewing ambiguous instructions, we inquire whether the jury was "reasonably likely" to have construed them in a manner that violated the defendant's rights. (*People v. Rogers, supra,* 39 Cal.4th at p. 873.) Applying this standard to the instructions given in the instant case, we conclude it was not reasonably likely the jury failed to understand that it was to apply the

accomplice testimony instructions to Hill.[9] Hill was the only possible accomplice indicated by the evidence. Indeed, her own testimony showed she was an accomplice. She testified she had been charged with first degree murder in connection with Kesha's death and ultimately pleaded guilty to involuntary manslaughter.

Furthermore, even where there is a failure to instruct on accomplice testimony, such error is harmless if there is sufficient corroborating evidence in the record. (*People v. Hayes, supra*, 21 Cal.4th at p. 1271.) Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense. (*Ibid.*) Sufficient corroborating evidence was provided in this case by the expert testimony about Kesha's injuries, Kelly Salay's testimony that she was with Hill and that defendant was in charge of Kesha during the afternoon that Kesha died, the neighbor's testimony that defendant verbally abused Kesha that afternoon (apparently in the midst of inflicting the fatal injuries), and defendant's own admissions that he was responsible for causing Kesha's death.

### 9. *Failure to Instruct on Second Degree Implied Malice Murder*

The trial court refused to instruct on second degree implied malice murder. As we explain, because there was no substantial evidence of second degree murder on an implied malice theory, the trial court properly refused the instruction.

#### a. *Background*

During the discussions on jury instructions, defense counsel asked the trial court to instruct on second degree murder. The court initially stated that if it were to give second degree murder instructions, it should read instructions on both unpremeditated express malice murder (CALJIC No. 8.30, Unpremeditated Murder of the Second Degree) and implied malice murder (CALJIC No. 8.31, Second Degree Murder—Killing Resulting from Unlawful Act Dangerous to Life). The prosecutor objected that the evidence did not support the implied malice murder instruction, CALJIC No. 8.31. He pointed out that paragraph 3 of that instruction requires the act be "deliberately performed with knowledge of the danger to, and with conscious disregard for human life." The prosecutor contended that the acts by which defendant killed Kesha were torturous acts, and that, if the jury determined defendant "deliberately performed" those acts, the jury necessarily would find defendant guilty of first degree murder by torture because first degree murder by torture does not

---

[9] Defendant does not claim any separate prejudice from the omission of the part of CALJIC No. 3.19 setting forth the defendant's burden of proof in showing that a witness was an accomplice.

require an intent to kill, but only requires that the torturous acts cause the death and be willfully performed with premeditation and deliberation. Defense counsel agreed. The trial court concluded it would not read CALJIC No. 8.31, but would give the jurors a modified version of CALJIC No. 8.32 (Second Degree Felony Murder) concerning second degree murder committed in the commission of the crime of torture.

When the trial court instructed the jury, it read CALJIC Nos. 8.30 and 8.32, but not CALJIC No. 8.31. The court also read, at defendant's request, CALJIC No. 8.45, which defined involuntary manslaughter, and CALJIC No. 8.72, which instructed the jury to find a homicide to be manslaughter if it had a reasonable doubt whether the crime was murder or manslaughter.

### b. *Analysis*

Implied malice murder is defined by CALJIC No. 8.31 as follows: "Murder of the second degree is [also] the unlawful killing of a human being when: [¶] 1. The killing resulted from an intentional act, [¶] 2. The natural consequences of which are dangerous to human life, and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. [¶] When the killing is the direct result of such an act, it is not necessary to prove that the defendant intended that the act would result in the death of a human being."

Defendant acknowledges the correctness of the prosecutor's argument that, if defendant committed torturous acts and those acts were done deliberately, an instruction on second degree implied malice murder would be inapplicable based on those torturous acts, since those acts would necessarily support a first degree murder by torture verdict. But defendant contends that the second degree implied malice murder instructions should have been given based on an entirely different intentional act deliberately performed by defendant, namely, defendant's intentional failure to take Kesha to the hospital after she was fatally wounded. Defendant contends that, although he denied inflicting the wounds that killed Kesha, he "effectively admitted" that he intentionally failed to take Kesha to the hospital, even though he knew she was gravely injured, because he wanted to protect Hill and did not want the authorities involved. Defendant contends his testimony supports the elements of second degree implied malice murder as follows: (1) the killing resulted from an intentional act (i.e., his failure to take Kesha to the hospital); (2) the natural consequence of failing to get medical treatment was obviously dangerous; and (3) it was done deliberately, in spite of the fact defendant knew that Kesha was severely injured.

Defendant's theory of second degree implied malice murder based on his failure to act was not raised in the trial court. Respondent contends the

claim is forfeited. However, the trial court had a sua sponte duty to instruct on "all theories of a lesser included offense which find substantial support in the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 162 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) But even though defendant's claim was not forfeited, we conclude there was no substantial evidence to support defendant's theory of implied malice murder.

As to the first element, defendant provides no authority that a failure to act can, on its own, constitute an "intentional act" for implied malice murder.[10] Certainly, if a defendant has a duty to provide aid to a victim, his or her failure to do so resulting in the victim's death can give rise to a charge of involuntary manslaughter. (See *People v. Oliver* (1989) 210 Cal.App.3d 138, 147–148 [258 Cal.Rptr. 138].) But, as noted above, the jury was instructed on involuntary manslaughter, and it nonetheless found defendant guilty of first degree murder.

As to the second and third elements, defendant's testimony does not provide substantial evidence that he knew that not immediately taking Kesha to the hospital would result in her death. Certainly, if one assumes that defendant in fact intentionally inflicted the fatal injuries through brutally striking Kesha and torturing her with hot oil, and therefore knew the severity of the wounds he had personally committed, then one could also plausibly assume he knew that failing to seek immediate medical care for her would result in her death. But defendant's implied malice theory is based on his testimony that he did *not* inflict the fatal wounds. The most that defendant's testimony indicates is that he was vaguely concerned about Kesha's condition immediately after Hill allegedly inflicted the burn wounds, despite her alleged minimizing of the significance of the burns. Defendant testified he did not become seriously concerned about Kesha's condition until several hours later, when Kesha's arm went limp while she was sleeping on his chest, at which point, according to his testimony, he immediately gave her CPR and told Hill to call 911.

---

[10] Acts by a defendant to prevent a victim from getting medical attention after the defendant has inflicted fatal wounds but before the victim dies can certainly be relevant to a theory of murder. (See, e.g., *People v. Koontz* (2002) 27 Cal.4th 1041, 1082 [119 Cal.Rptr.2d 859, 46 P.3d 335] [defendant shooting at vital area of the body at close range, then preventing witness from calling an ambulance supported verdict of premeditated and deliberate first degree murder].) As discussed above (see *ante*, at pp. 201–202), evidence of defendant's actions to prevent Hill from phoning 911 after his infliction of the fatal wounds to Kesha is relevant evidence of defendant's premeditated intent to kill. But defendant's argument here is that, assuming defendant did *not* inflict the wounds, his failure to seek medical help immediately would in and of itself provide the basis for implied malice murder.

10. *Instruction That Motive Is Not an Element of Murder by Torture*

The trial court instructed with CALJIC No. 2.51, which states, inter alia, that "[m]otive is not an element of the crime charged and need not be shown." Defendant contends this instruction had the effect of negating the element of "sadistic purpose" in the first degree murder by torture instruction, CALJIC No. 8.24. Defendant acknowledges the Court of Appeal has already rejected this contention in *People v. Lynn* (1984) 159 Cal.App.3d 715, 728 [206 Cal.Rptr. 181], which holds that a trial court does not err in instructing the jury that motive is not an element of murder by torture. Defendant asks us to disapprove *Lynn*, but because we conclude *Lynn* correctly decided this issue, we decline to do so. As we have noted in rejecting another similar challenge to CALJIC No. 2.51, "although malice and certain intents and purposes are elements of the crimes, . . . *motive* is not an element." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503–504 [117 Cal.Rptr.2d 45, 40 P.3d 754].) "Motive describes the reason a person chooses to commit a crime. The reason, however, is different from a required mental state such as intent or malice." (*Id.* at p. 504.)

11. *Refusal to Give Additional Instruction on Premeditation and Deliberation*

Defendant contends the trial court erred in refusing to give his proposed additional instruction defining premeditation and deliberation. Alternatively, defendant contends the definition of premeditation and deliberation in CALJIC No. 8.24, the instruction concerning first degree murder by torture, is inadequate because it does not contain as detailed a description of premeditation and deliberation as that found in CALJIC No. 8.20, the instruction for first degree premeditated and deliberate murder, which the trial court also gave. As we explain, we conclude that the trial court did not err in refusing defendant's additional instruction, and that CALJIC No. 8.24 adequately instructed the jury on the element of premeditation and deliberation in first degree murder by torture.

The defense, citing *People v. Thomas* (1945) 25 Cal.2d 880, 901 [156 P.2d 7], requested the following additional instruction elaborating on the definition of premeditation and deliberation: "The word 'deliberate' is an antonym of 'Hasty, impetuous, rash, impulsive' [citation] and no act or intent can truly be said to be 'premeditated' unless it has been the subject of actual deliberation or forethought . . . ." The trial court refused this additional instruction. Defendant acknowledges we previously have upheld a trial court's refusal to give additional instructions on premeditation and deliberation on the ground that CALJIC No. 8.20, the standard instruction for first degree premeditated

and deliberate murder, was sufficient. (*People v. Moon* (2005) 37 Cal.4th 1, 31–32 [32 Cal.Rptr.3d 894, 117 P.3d 591].) We draw the same conclusion in the instant case.

Alternatively, defendant contends that, assuming CALJIC No. 8.20 adequately instructed on first degree premeditated and deliberate murder, the trial court nonetheless erred in instructing with CALJIC No. 8.24, the first degree murder by torture instruction, because its explanation of premeditation and deliberation is shorter than that of CALJIC No. 8.20.[11] Defendant notes that while CALJIC Nos. 8.20 and 8.24 share the same essential definition of "deliberate" and "premeditated," CALJIC No. 8.20 has four additional paragraphs, which further elaborate the concepts of premeditation and deliberation.[12]

■ This issue was never raised below, but defendant contends his refused additional instruction on premeditation and deliberation preserves his claim on appeal about the adequacy of the definition of premeditation and deliberation in CALJIC No. 8.24. But even assuming defendant's claim is preserved, we conclude it is meritless. First degree murder by torture requires the same proof of deliberation and premeditation as is required of other types of first degree murders. (*People v. Steger, supra*, 16 Cal.3d at p. 546.) This required element is the willful, deliberate, and premeditated intent to cause

---

[11] The court instructed with CALJIC No. 8.24 (1992 rev.): "Murder which is perpetrated by torture is murder of the first degree. [¶] The essential elements of murder by torture are: [¶] 1. One person murdered another person, and 2. The perpetrator committed the murder with a willful, deliberate, and [¶] premeditated intent to inflict extreme and prolonged pain upon a living human being for the purpose of revenge, extortion, persuasion or for any sadistic purpose[,][.] [¶] [3. The acts or actions taken by the perpetrator to inflict extreme and prolonged pain were a cause of the victim's death.] [¶] The crime of murder by torture does not require any proof that the perpetrator intended to kill his victim, or any proof that the victim was aware of pain or suffering. [¶] The word 'willfull' as used in this instruction means intentional. [¶] The word 'deliberate' means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. [¶] The word 'premeditated' means 'considered beforehand.' "

[12] Those paragraphs from CALJIC No. 8.20 are: "If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree. [¶] The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances. [¶] The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it include an intent to kill, is not such deliberation and premeditation as will fix an unlawful killing as murder of the first degree. [¶] To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, he decides to and does kill."

extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose. (*People v. Cook, supra*, 39 Cal.4th at p. 602.) We have previously concluded that the version of CALJIC No. 8.24 used in defendant's trial adequately instructs on first degree murder by torture, including the willful, deliberate, and premeditated intent element. (See *People v. Cook, supra*, 39 Cal.4th at p. 602.) The mere fact that CALJIC No. 8.20 has a lengthier exposition of premeditation and deliberation does not render the description of premeditation and deliberation in CALJIC No. 8.24 inadequate. Furthermore, in assessing a claim of instructional error, we consider the entire charge to the jury, and not simply the asserted deficiencies in the challenged instruction. (*People v. Lewis* (2001) 25 Cal.4th 610, 649 [106 Cal.Rptr.2d 629, 22 P.3d 392].) Here, the trial court instructed the jury to consider the instructions as a whole and each in light of all the others, under CALJIC No. 1.01. Therefore, it was not necessary for the court to modify CALJIC No. 8.24 so as to repeat definitions of premeditation and deliberation which were already provided to the jury through CALJIC No. 8.20.

### 12. *Refusal to Give Additional Instruction on Lack of Motive*

Citing *People v. Sears* (1970) 2 Cal.3d 180, 190 [84 Cal.Rptr. 711, 465 P.2d 847], defense counsel proposed the following special jury instruction: "Lack of motive is a circumstance which may be considered by the jury in determining the issue of whether or not the defendant premeditated and deliberated." The trial court refused the instruction, stating the instruction was already covered by CALJIC No. 2.51.

■ "Under appropriate circumstances, 'a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case . . . .' " (*People v. Coffman and Marlow, supra*, 34 Cal.4th at p. 99.) However, a trial court need not give a pinpoint instruction if it merely duplicates other instructions. (*Ibid.*) The trial court instructed with CALJIC No. 2.51, which states: "Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish guilt. Absence of motive may tend to establish innocence. You will therefore give its presence or absence, as the case may be, the weight to which you find it to be entitled." The principle expressed in the refused instruction (that lack of motive may be considered in determining whether defendant premeditated and deliberated) was therefore already expressed in CALJIC No. 2.51.

### 13. *Unconstitutionality of Jury Instructions Assertedly Affecting the Beyond a Reasonable Doubt Standard*

■ Defendant contends that 12 standard CALJIC instructions violated defendant's right, under *In re Winship* (1970) 397 U.S. 358, 364 [90 S.Ct.

1068, 25 L.Ed.2d 368], not to be convicted of a crime on a standard of less than beyond a reasonable doubt. Defendant acknowledges we have previously rejected similar challenges to these instructions, but requests we change our position. We decline to do so and summarily reaffirm our previous holdings upholding the constitutionality of the following instructions: CALJIC Nos. 2.01, 2.02, 8.83, and 8.83.1 (*People v. Nakahara* (2003) 30 Cal.4th 705, 713–714 [134 Cal.Rptr.2d 223, 68 P.3d 1190]; *People v. Guerra, supra*, 37 Cal.4th at pp. 1138–1139); CALJIC Nos. 1.00 and 2.51 (*People v. Guerra, supra*, 37 Cal.4th at p. 1139); CALJIC No. 2.21.1 (*People v. Brasure* (2008) 42 Cal.4th 1037, 1059, fn. 15 [71 Cal.Rptr.3d 675, 175 P.3d 632]); CALJIC Nos. 2.21.2, 2.22, 8.20 (*Nakahara, supra*, 30 Cal.4th at pp. 714–715; *People v. Guerra, supra*, 37 Cal.4th at pp. 1138–1139); CALJIC No. 2.27 (*People v. Montiel* (1993) 5 Cal.4th 877, 941 [21 Cal.Rptr.2d 705, 855 P.2d 1277]; *People v. Turner* (1990) 50 Cal.3d 668, 697 [268 Cal.Rptr. 706, 789 P.2d 887]); and CALJIC No. 2.03 (*People v. Stitely* (2005) 35 Cal.4th 514, 555 [26 Cal.Rptr.3d 1, 108 P.3d 182]).

### 14. *Unconstitutionality of the Reasonable Doubt Instruction*

The trial court instructed on reasonable doubt with CALJIC No. 2.90 (1994 rev.).[13] Defendant raises various objections to the constitutionality of this instruction, all of which have been rejected by this court. (See *People v. Ray* (1996) 13 Cal.4th 313, 347 [52 Cal.Rptr.2d 296, 914 P.2d 846] [citing cases upholding the traditional definitions of reasonable doubt in capital trials]; see also *People v. Hearon* (1999) 72 Cal.App.4th 1285, 1287 [85 Cal.Rptr.2d 424] [given universal approval of this instruction by both California courts and the Ninth Circuit, issue of its constitutionality is "conclusively settled"].)

### 15. *Unconstitutionality of the Consciousness of Guilt Instruction*

The trial court instructed with CALJIC No. 2.03, an instruction permitting the jury to infer a defendant's consciousness of guilt from a false or misleading statement. Defendant contends this instruction was unconstitutional because it was impermissibly argumentative and allowed the jury to draw irrational inferences. Defendant acknowledges we have previously

---

[13] In *Victor v. Nebraska* (1994) 511 U.S. 1, 16–17 [127 L.Ed.2d 583, 114 S.Ct. 1239], the United States Supreme Court upheld the constitutionality of CALJIC No. 2.90, but criticized its use of the phrase "moral certainty." (See *People v. Freeman* (1994) 8 Cal.4th 450, 501–505 [34 Cal.Rptr.2d 558, 882 P.2d 249].) The phrase "moral certainty" was removed from the 1994 version. (See 2 CALJIC (6th ed. 1996) appen. B, Reasonable Doubt—The California Experience, pp. 665–671.)

rejected both arguments, and we summarily reaffirm our previous holdings. (*People v. Stitely, supra*, 35 Cal.4th at p. 555; *People v. Benavides* (2005) 35 Cal.4th 69, 100 [24 Cal.Rptr.3d 507, 105 P.3d 1099]; *People v. Nakahara, supra*, 30 Cal.4th at p. 713.)

### 16. *Instruction on First Degree Murder*

■ Defendant contends the trial court erroneously instructed on first degree murder because the information did not charge him with first degree murder and did not allege the facts necessary for establishing first degree murder. But, as he acknowledges, we have consistently rejected such arguments. The information charged defendant with malice murder in violation of section 187, which, as we have held for almost a century, includes both degrees of murder. (*People v. Hughes* (2002) 27 Cal.4th 287, 368–370 [116 Cal.Rptr.2d 401, 39 P.3d 432]; *People v. Witt* (1915) 170 Cal. 104, 107–108 [148 P. 928].) Defendant also contends that *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], prohibits defendant's conviction on an uncharged crime. His reliance on *Apprendi*, however, is misplaced because he was not convicted of an "uncharged crime." (See *People v. Brasure, supra*, 42 Cal.4th at p. 1058.)

### 17. *Failure to Instruct on Unanimity for the Theory of First Degree Murder*

Defendant contends the trial court erred by failing to instruct the jurors that they must agree unanimously on a theory of first degree murder (in this case, premeditated murder or murder by torture) in order to find defendant guilty of the charge. We have repeatedly rejected this type of claim and do so again here. (*People v. Cole* (2004) 33 Cal.4th 1158, 1221 [17 Cal.Rptr.3d 532, 95 P.3d 811].)

### 18. *Unconstitutionality of CALJIC No. 8.75*

■ The jury was instructed with CALJIC No. 8.75, which, inter alia, informs the jurors that, although they are not precluded from considering or discussing lesser included offenses before returning a verdict on the greater offense, the trial court cannot accept a verdict as to a lesser included offense unless the jury first unanimously finds the defendant not guilty of the greater offense. Defendant contends CALJIC No. 8.75 is unconstitutional. As defendant acknowledges, we have upheld the "acquittal first" rule, namely, that a jury must unanimously agree to acquit a defendant of a greater charge before returning a verdict on a lesser charge. (*People v. Fields* (1996) 13 Cal.4th 289, 309–311 [52 Cal.Rptr.2d 282, 914 P.2d 832].) Since *Fields*, we have repeat-

edly rejected arguments similar to those raised by defendant that the "acquittal first" rule "precludes full jury consideration of lesser included offenses" and encourages "false unanimity" and "coerced verdicts." (See *People v. Nakahara, supra,* 30 Cal.4th at p. 715; *People v. Riel* (2000) 22 Cal.4th 1153, 1200–1201 [96 Cal.Rptr.2d 1, 998 P.2d 969].) We do so again here.

### 19. *Unconstitutionality of the Prosecution's Reference to Itself as "The People"*

Defendant contends the prosecution's reference to itself as representing "the People" violated his right to due process and other constitutional rights. We have previously rejected such claims and do so again here. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1068 [47 Cal.Rptr.3d 467, 140 P.3d 775]; see also *People v. Black* (2003) 114 Cal.App.4th 830, 832–834 [7 Cal.Rptr.3d 902].)

### 20. *Unconstitutionality of the Murder by Torture and Torture Special Circumstance Instructions*

As noted, the court instructed with CALJIC No. 8.24, the first degree murder by torture instruction and CALJIC No. 8.81.18, the torture special circumstance instruction, both of which use the word "extreme" and the phrase "for any sadistic purpose." Defendant contends this language renders these instructions unconstitutionally vague and overbroad. We have previously rejected such claims and do so again here. (*People v. Mincey, supra,* 2 Cal.4th at p. 455; *People v. Raley* (1992) 2 Cal.4th 870, 898–902 [8 Cal.Rptr.2d 678, 830 P.2d 712].)

### C. *Penalty Phase Issues*

### 1. *Admission of Photographs of the Victim at the Penalty Phase*

As recounted above (see *ante,* at pp. 211–212), at the guilt phase, the trial court admitted the prosecution's photographs of the victim's fatal injuries. At the penalty phase, defense counsel urged the court not to allow the prosecutor to use these photographs, contending the photographs had no probative value at the penalty phase. The prosecutor responded that the photographs were part of the circumstances of the offense and thus were relevant to aggravation, and he indicated his intention to present one or two photographs during his closing argument. The trial court ruled the photographs admitted at the guilt phase were admissible at the penalty phase. During his penalty phase summation, the prosecutor showed the jury two of the photographs and

briefly referred to them as part of his argument for imposing the death penalty.

As an extension of his claim that the photographs were improperly admitted at the guilt phase, defendant contends they were also improperly admitted at the penalty phase. As we have concluded with respect to the photographs admitted at the guilt phase, we also conclude there was no error at the penalty phase. Because the photographs depicted the circumstances of the offense and were relevant to aggravation, the trial court did not abuse its discretion in admitting the photographs.

### 2. *Admission of Unadjudicated Crime*

Defendant contends the trial court erred at the penalty phase in admitting evidence of defendant's act of violence against his niece because it did not conduct a proper hearing pursuant to *People v. Phillips* (1985) 41 Cal.3d 29 [222 Cal.Rptr. 127, 711 P.2d 423]. As we explain, we conclude the trial conducted a proper *Phillips* hearing, and properly admitted the evidence.

### a. *Background*

As discussed above (see *ante,* at pp. 209–211), at the guilt phase, the prosecution cross-examined defendant about the incident in which he had physically abused his niece, Kayla, by breaking her leg. At the penalty phase, pursuant to section 190.3, factor (b), the prosecutor sought to introduce evidence of this incident by calling Dr. Mark Shallit, one of the doctors who had treated Kayla when she was brought to the emergency room on December 13, 1987. Defense counsel objected to the admission of this evidence and requested that the court hold a hearing pursuant to *People v. Phillips, supra,* 41 Cal.3d 29, at which the prosecution would be required to prove there was sufficient evidence of the crime to permit its admission. The trial court held a *Phillips* hearing. Dr. Shallit testified that, although he had no recollection of the incident, based upon his records from that day, his opinion was that Kayla's femur had been deliberately broken. Following Dr. Shallit's testimony, the defense sought to introduce the testimony of Robert Sandoval, the child protective services (CPS) social worker who investigated the incident and decided not to file charges against defendant. He had been subpoenaed by the defense, but CPS officials refused to let him testify, citing confidentiality rules. The defense asked for a continuance of two days to sort through the confidentiality concerns and secure Sandoval's testimony at the hearing. The trial court denied the request for continuance and ruled the prosecution had shown sufficient evidence that the issue could go before the jury. As

recounted above, Dr. Shallit, a police officer, and Sandoval then testified to the jury about the incident.

### b. *Analysis*

In *Phillips*, we admonished that "in many cases it may be advisable for the trial court to conduct a preliminary inquiry before the penalty phase to determine whether there is substantial evidence to prove each element" of other violent crimes the prosecution intends to introduce in aggravation under section 190.3, factor (b). (*People v. Phillips, supra*, 41 Cal.3d at p. 72, fn. 25; see *People v. Boyer, supra*, 38 Cal.4th at p. 476, fn. 48.) As we have clarified, such a hearing is not required, but if it is held, it need not include the presentation of live testimony. (*People v. Boyer, supra*, 38 Cal.4th at p. 477, fn. 51.) "Moreover, a trial court's decision to admit 'other crimes' evidence at the penalty phase is reviewed for abuse of discretion, and no abuse of discretion will be found where, in fact, the evidence in question was legally sufficient." (*Ibid.*)

Defendant contends the trial court did not have all the relevant evidence to make the necessary determination for a *Phillips* hearing because it did not hear Sandoval's testimony. But the purpose of a *Phillips* hearing is to determine whether the prosecution has substantial evidence to support the other-crimes evidence it intends to introduce in aggravation. As the trial court correctly ruled, the prosecution presented substantial evidence of the other crime through the testimony of Dr. Shallit and thus met its burden. Furthermore, even assuming the trial court failed to conduct an adequate *Phillips* hearing because it failed to consider Sandoval's testimony at the hearing, defendant's claim still fails because the prosecution presented to the penalty phase jury sufficient evidence of defendant's abuse of Kayla through the testimony of Dr. Shallit and the police officer. The trial court therefore did not abuse its discretion by admitting the evidence of the incident involving Kayla.

### 3. *Refusal of Defendant's Proposed Penalty Phase Instructions*

Defendant contends the trial court erred in refusing his numerous proposed penalty phase jury instructions. Defendant proposed jury instructions in three areas: first, the jury's task at the penalty phase as moral and normative; second, aspects of the notion of mitigation; and third, weighing aggravation against mitigation. The trial court refused these instructions, generally stating that their substance was covered by the CALJIC jury instructions. Defendant acknowledges we have previously rejected arguments similar to the ones he presents here, but urges us to reconsider this issue. We decline to do so, and we reaffirm our previous decisions explaining that the

CALJIC jury penalty phase instructions " 'are adequate to inform the jurors of their sentencing responsibilities in compliance with federal and state constitutional standards.' " (*People v. Gurule, supra*, 28 Cal.4th at p. 659, quoting *People v. Barnett* (1998) 17 Cal.4th 1044, 1176–1177 [74 Cal.Rptr.2d 121, 954 P.2d 384].)

### 4. *Refusal to Instruct on the Definition of "Life Without the Possibility of Parole"*

The defense proposed two different instructions on the definition of life without the possibility of parole, stating that life without possibility of parole "means exactly what it says," and that it means that "defendant is not eligible for parole." The trial court refused to give either instruction. Defendant acknowledges that we have stated that a California penalty jury is instructed that one of the sentencing choices is "life without parole," and that this is a common phrase requiring no further definition. (*People v. Wilson* (2005) 36 Cal.4th 309, 352–353 [30 Cal.Rptr.3d 513, 114 P.3d 758].) Defendant asks us to reconsider our position, but we decline to do so.

### 5. *Refusal to Instruct on the Role of Mercy in the Penalty Determination*

Defense counsel requested four instructions dealing with mercy. The defense also requested a special "mercy verdict," which informed the jurors they could sentence defendant to life without parole even if they felt that the aggravating circumstances outweighed the mitigating. The trial court refused to give any of these instructions and refused to read the "mercy verdict." But the court did read a limited instruction in which mercy was mentioned. The court also gave CALJIC Nos. 8.85 and 8.88, which we have stated are sufficient to convey to the jury that it may consider mercy. (See *People v. Panah* (2005) 35 Cal.4th 395, 497 [25 Cal.Rptr.3d 672, 107 P.3d 790]; *People v. Brown* (2003) 31 Cal.4th 518, 569–570 [3 Cal.Rptr.3d 145, 73 P.3d 1137]; *People v. Hughes, supra*, 27 Cal.4th at p. 403.) As defendant concedes, no specific mercy instruction is required if other pertinent instructions are given. (See *Hughes, supra*, 27 Cal.4th at p. 403.) Defendant asks us to reconsider this conclusion, but we decline to do so.

### 6. *Refusal to Instruct the Jury to Not Rely Solely on the Facts of the Murder Verdict and the Special Circumstance as Aggravating Factors*

Defendant requested an instruction informing the jury it could not sentence him to death based solely upon the same facts that caused it to find him guilty of first degree murder, and a similar instruction reminding the jury

that it could use neither the fact of the first degree murder conviction nor the special circumstance as an aggravating circumstance. The trial court refused to give these instructions. We have previously rejected the claim that it is error for a trial court to refuse such instructions and do so again here. (*People v. Moon, supra,* 37 Cal.4th at pp. 39–41; *People v. Earp* (1999) 20 Cal.4th 826, 900–901 [85 Cal.Rptr.2d 857, 978 P.2d 15].)

### D. *Challenges to California's Death Penalty Law*

Defendant raises various challenges to California's death penalty law. We affirm the decisions that have rejected similar claims, and decline to reconsider such authorities, as follows:

Death qualification and the resulting excusal of several prospective jurors for cause based on their views on the death penalty is constitutional. (*People v. Breaux* (1991) 1 Cal.4th 281, 306 [3 Cal.Rptr.2d 81, 821 P.2d 585].)

The absence of intercase proportionality review does not violate the Eighth and Fourteenth Amendments to the United States Constitution. (*People v. Cook* (2007) 40 Cal.4th 1334, 1368 [58 Cal.Rptr.3d 340, 157 P.3d 950]; *People v. Moon, supra,* 37 Cal.4th at p. 48; see also *Pulley v. Harris* (1984) 465 U.S. 37, 50–51 [79 L.Ed.2d 29, 104 S.Ct. 871] [intercase proportionality review not required by the federal Constitution].)

The death penalty scheme is not unconstitutional because it fails to allocate the burden of proof—or establish a standard of proof—for finding the existence of an aggravating factor, or because it does not require the jury to find that the aggravating factors outweigh the mitigating factors, or that death is an appropriate penalty. (*People v. Geier* (2007) 41 Cal.4th 555, 618 [61 Cal.Rptr.3d 580, 161 P.3d 104]; *People v. Stitely, supra,* 35 Cal.4th at p. 573.) The United States Supreme Court's recent decisions interpreting the Sixth Amendment's jury trial guarantee (*Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856]; *United States v. Booker* (2005) 543 U.S. 220 [160 L.Ed.2d 621, 125 S.Ct. 738]; *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531]; *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428]; *Apprendi v. New Jersey, supra,* 530 U.S. 466) have not altered our conclusions in this regard. (*People v. Salcido* (2008) 44 Cal.4th 93, 167; *People v. Hoyos, supra,* 41 Cal.4th at p. 926.)

The penalty phase instructions were not defective in failing to assign a burden of persuasion regarding the jury's penalty decision (*People v. Smith* (2005) 35 Cal.4th 334, 370–371 [25 Cal.Rptr.3d 554, 107 P.3d 229]), in failing to require juror unanimity on the aggravating factors (*People v. Abilez*

(2007) 41 Cal.4th 472, 533 [61 Cal.Rptr.3d 526, 161 P.3d 58]), nor in failing to include an instruction on the "presumption of life." (*People v. Geier, supra,* 41 Cal.4th at p. 618.)

Section 190.3, factor (a), is neither vague nor overbroad, and does not impermissibly permit arbitrary and capricious imposition of the death penalty. (*People v. Guerra, supra,* 37 Cal.4th at p. 1165.)

The jury may properly consider evidence of unadjudicated criminal activity under factor (b) of section 190.3. (*People v. Panah, supra,* 35 Cal.4th at p. 499.)

The use of the adjective "extreme" in factor (d) of section 190.3 does not render the statute unconstitutional. (*People v. Prieto* (2003) 30 Cal.4th 226, 276 [133 Cal.Rptr.2d 18, 66 P.3d 1123].)

Written findings regarding the aggravating factors are not constitutionally required. (*People v. Prieto, supra,* 30 Cal.4th at p. 275.)

The trial court was not constitutionally required to inform the jury that certain sentencing factors are relevant only in mitigation, and the statutory instruction to the jury to consider "whether or not" certain mitigating factors were present did not unconstitutionally suggest that the absence of such factors amounted to aggravation. (*People v. Kraft* (2000) 23 Cal.4th 978, 1078–1079 [99 Cal.Rptr.2d 1, 5 P.3d 68].)

The death penalty law does not deny capital defendants equal protection. (*People v. Hinton* (2006) 37 Cal.4th 839, 913 [38 Cal.Rptr.3d 149, 126 P.3d 981].)

The death penalty is not cruel and unusual punishment in violation of the Eighth Amendment. (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1255 [69 Cal.Rptr.2d 784, 947 P.2d 1321].)

International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements. (*People v. Guerra, supra,* 37 Cal.4th at p. 1164.)

E. *Cumulative Error*

Defendant contends the cumulative effect of the asserted guilt and penalty phase errors require reversal of his conviction and death sentence even if none of the errors is prejudicial individually. We conclude that there was no cumulative effect requiring reversal.

## III. CONCLUSION

We affirm the judgment in its entirety.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied September 24, 2008. Corrigan, J., did not participate therein.