Filed 5/2/25  P. v. Santo CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B334614 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA114416) |
| v. | |
| MARK ANTHONY SANTO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura Laesecke, Judge.  Affirmed.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Amanda V. Lopez and Nicholas J. Webster, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Mark Anthony Santo (defendant), a former middle school and high school teacher, of various criminal sex offenses involving two girls under the age of 14 and an 18-year-old woman who was his former middle school student. The trial court sentenced him to prison for a total term of 80 years to life. We are asked to consider whether reversal is required because the trial court should not have admitted evidence of other uncharged bad acts to prove criminal intent and absence of mistake.

## I. BACKGROUND

For eleven years, from approximately 2002 to 2013, defendant taught history, psychology, and other subjects at Lindbergh Middle School. Then, after a year at Poly High School, defendant transferred to Jordan High School, where he taught for almost four years (and acted as the school's athletic director)—until he was put on administrative leave in February 2018. He was later criminally charged in an information with two counts of committing a lewd act on a child under 14 (Pen. Code, § 288, subd. (a)), two counts of assault to commit specified sex offenses (Pen. Code, § 220, subd. (a)(1)), sexual penetration by force (Pen. Code, § 289, subd. (a)(1)(A), and forcible oral copulation (Pen. Code, § 288a, subd. (c)(2)(A)). Trial on the charges proceeded in May 2023.

### A. Defendant's Charged Offense Conduct
#### 1. Committing a lewd act on H.C. (count 6)

When H.C. was 13 years old and in eighth grade (2012-2013), she attended Lindbergh Middle School where defendant was her history teacher. At the beginning of eighth grade, H.C.

2

was performing poorly at school and suffering verbal and physical abuse at home from her alcoholic father.

Defendant helped H.C. with her academic performance and self-esteem, and she confided in him about her home life. She regarded his classroom as a "safe place" and came to regard defendant as a "father figure," with whom she shared things that she did not share with her parents. Defendant told H.C. she was like a daughter to him and that she was "beautiful and smart," which made her feel "very happy . . . I felt like I was seen for the first time." When she hugged defendant, he would sometimes also give her a kiss on the cheek, face, or neck, which made her feel "weird." In addition to face-to-face communication at school, defendant and H.C. would correspond via text messaging and through social media.

One day, H.C. came to defendant and told him that her father hit her the night before while intoxicated. After she related the incident to defendant, he told her she could rest in a small room located at the back of his classroom that had a couch. H.C. accepted the offer and spent the day curled up on the couch.

Throughout the day, defendant would periodically check on her. On one such occasion, as H.C. was lying facing the couch's back pillows, defendant got on the couch next to her, "cuddling" her from behind and "spooning" her. Defendant rubbed her shoulders, back, thigh, and hip. While he did so, H.C. could feel defendant's erect penis against her "bottom area." Defendant stopped touching H.C. when his next class started.[1]

---

[1]    At trial, H.C. testified to a somewhat similar event two years later when she was a student and defendant was a teacher at Jordan High School. Despondent over her aunt's death, H.C. attempted to commit suicide by swallowing half a bottle of

H.C. did not tell her parents or anyone else about how defendant touched her on the couch at the time it happened. As H.C. grew older, she grew "uncomfortable" with defendant's attempts to hug her and she would avoid them "as much as [she] could."

### 2. *Committing a lewd act on M.S. (count 1)*

M.S. was never defendant's student, but she was a friend of defendant's daughter and spent a lot of time with defendant's family. M.S. also often spent the night at defendant's home because his wife worked at the middle school M.S. attended and could take her to school in the morning. Over time, M.S. came to regard defendant and his wife as her "second parents."

During the period when she was spending time with defendant and his family at their home, M.S. created a Snapchat account. Although her parents at that time did not allow her to have such an account, defendant, after learning of it through his daughter, promised to keep the account secret from M.S.'s parents if he could monitor it. As time went on, defendant began to communicate with M.S. via Snapchat; she found some of his messages unobjectionable, but others, which were sent at night, were "inappropriate."

Defendant, who described himself to M.S. as a masseuse, often gave massages to her and others. On at least one occasion, he put his fingers inside the waistline of M.S.'s jeans as he

Benadryl. The following day, she told defendant about her suicide attempt and he told her she could relax and recover in a recliner chair in his classroom. At some point, H.C. fell asleep and awoke to find defendant next to her, rubbing her thigh. No charges were filed regarding this incident.

4

massaged her, which made her feel "uncomfortable." Because it happened in the presence of others, however, she did not think it wrong at the time.

One night in October 2015, when M.S. was 13 years old and a student in eighth grade, she was sleeping over at defendant's home on a school night. At around midnight, M.S. was lying on a couch in the living room; she was supposed to be asleep, but was awake and "on her phone." When she heard footsteps coming from defendant's bedroom, M.S. hid her phone and pretended to be asleep. M.S. was lying on her back and defendant came to the couch and stroked her outer and inner thigh, her hip, and her vagina over the shorts she was wearing. Although she kept her eyes closed the entire time, she knew it was defendant because "he had a distinct smell and[,] like[,] you could feel who it is, you know." She did not move while defendant touched her because she was "scared" and "so shocked."

After defendant's lewd touching, M.S. did not tell her parents (or others) because she "figured it was a one-time thing and [she] could pretend that it didn't happen and [she] wouldn't ruin everything." But M.S. started spending less time with defendant and his family and began acting out to avoid being around defendant (e.g., stealing a phone case belonging to defendant's daughter and displaying the case in an obvious manner to defendant's wife). She remained in contact with defendant via social media, though.

Over time, the relationship between M.S. and defendant's wife became strained because M.S. believed defendant's wife was creating fake accounts to follow her (M.S.'s) social media posts and harassing her. M.S. eventually responded by calling defendant's wife and telling her "that her husband was talking to

5

little girls and he was a pedophile . . . ." After that call, M.S. received a text message from defendant apologizing to her and her mother for "[his] actions," admitting he "was losing affection in [his] home [and] start[ing] to find it online with anyone who would listen," and stating M.S. "was always sincere in her feelings towards me as a father figure and I broke that trust in her" by "allow[ing] [his] lack of affection at home to manifest into . . . online flirting that should not have happened."

M.S. later moved out-of-state, but defendant continued to communicate with her via Snapchat. Some of defendant's messages commenting on photographs of M.S. or discussing ways for them to meet without his wife knowing were "inappropriate." In one such message responding to M.S.'s post of a swimsuit and asking if she should purchase it, defendant responded by saying, "Only if I get to see you in it. Hubba hubba." Feeling "so awkward," M.S. replied with only a quick "haha," to which defendant responded, "You know I think you're amazing, right?" Again, M.S. responded with only a "haha."

### 3. Forcible penetration, forcible copulation, and assault of E.L. (counts 2-5)

E.L. first met defendant when he was her seventh grade history teacher at Lindbergh Middle School. During her middle school years, she suffered physical abuse from her adoptive mother and sexual abuse from her stepfather. E.L. confided in defendant about her problems at home so much that she came to regard him as a "parent figure." In addition, defendant would take on the role of a "father figure" in regard to her academic progress by helping her stay on top of her work and advocating for her with the principal and school counselors.

After she graduated eighth grade, E.L. moved away but stayed in touch with defendant because he reached out to her on social media. When E.L. returned to the area, she reconnected with defendant through her attendance at Jordan High School and through her close friendship with defendant's daughter, who was enrolled at the same high school. Because E.L.'s classroom was across the hall from defendant, she would often talk with him about her problems at home or school and, for a time, she continued to regard him as playing a "parent[al] role" in her life.

E.L.'s view of defendant changed, however, after an incident in his classroom one day. Defendant told her that he had been a masseuse and began to massage her shoulders. He then had E.L. lie on the floor, and as he gave her a back massage, he repeatedly tried to pull her jeans down but she would not let him. Because she found the experience "weird," she got up, left the classroom, and promptly told her sister and mother about what happened.

E.L. withdrew further from defendant because of social media messages he sent her. For example, in December 2017, defendant sent a photo of himself standing behind a counter and apparently nude with the caption: "Jacuzzi time. Wish you could join me." At around the same time, defendant sent her another photo of himself captioned: "You would be a wonderful gift to have under my tree." Later that month, defendant left a voice-mail message on E.L.'s phone asking her to "verify" for his wife, who was also on the call, that he had never done anything "inappropriate" with her.

In February 2018, when she was 18 years old, E.L. and defendant's daughter attended a concert together. Following the concert, E.L. and her own infant daughter spent the night at

defendant's home.  The next afternoon, E.L. and defendant watched a movie in the home's living room while defendant's daughter and the baby were napping.  As they watched the movie, defendant invited E.L. to join him in having an alcoholic beverage; she declined.

After the movie ended, defendant invited E.L. to view a room where she and her daughter could stay if problems at E.L.'s home continued.  As they went through a short hallway connected to a restroom, defendant pulled E.L. close and tried to kiss her.  As he did so, he also put his hand down the front of her pants and touched her vaginal area.  Feeling both "scared" and "disgusted," E.L. "froze."  Defendant grabbed E.L. by the shoulders, sat her down on the toilet, and tried repeatedly to force his penis into her mouth.  After he ejaculated onto her t-shirt, defendant told her "that's what he had been waiting for."

E.L. left the restroom in tears, called one of her friends and her then-boyfriend, and placed the shirt she was wearing in a bag.[2]  During the next school week, she reported the incident to a school counselor and a police officer.

### B.      The Uncharged Sexual Misconduct Evidence Admitted at Trial

Before defendant's trial, the prosecution moved to admit evidence of other uncharged acts by defendant—specifically, inappropriate social media communications with students and improper touching of two other underage girls.  The prosecution argued the evidence was admissible under Evidence Code section

---

[2]      Later forensic testing of the shirt revealed the presence of defendant's DNA.

1101 to show defendant's intent and absence of mistake. In addition, the prosecution contended evidence of defendant's inappropriate touching of the two girls, M.U. and L.B., was admissible under Evidence Code section 1108 because defendant's touching of M.U. constituted a lewd and lascivious act on a minor (Pen. Code, § 288, subd. (c)(1)) or an act annoying or molesting a child under the age of 18 (Pen. Code, § 647.6) and his touching of L.B. constituted sexual battery (Pen. Code, § 243.4, subd. (e)(1)) or an act annoying or molesting a child under the age of 18 (Pen. Code., § 647.6). The defense opposed the motion on hearsay and lack of foundation grounds, and on the ground that admission of the evidence would be unduly prejudicial and a waste of the jury's time.

The trial court granted the prosecution's motion. The court found the uncharged other acts evidence the prosecution sought to introduce was (1) relevant to proving defendant's intent and the absence of mistake in connection with the charged offenses and (2) not unduly prejudicial and not likely to confuse the issues or mislead the jury. In accordance with the trial court's ruling, the prosecution introduced other acts evidence at trial.

### 1. *Testimony concerning defendant's social media communications with underage students*

During the 2012-2013 academic year (defendant's last at Lindbergh Middle School), Natalie Ramirez (Ramirez) worked as a counseling clerk at the school and followed other school employees and teachers on social media, including defendant. At the time, the school district had a policy that limited online communications between teachers and students to academic subjects only.

In early 2013, Ramirez received notifications that defendant "liked" two sexually suggestive photos posted on Instagram by female students at Lindbergh Middle School: one showed a girl lying on a bed in a tank top shirt and the other showed the same girl walking with another girl with their hands on each other's buttocks. After viewing the photographs, Ramirez found defendant's reaction to them "concerning."

The following day, Ramirez spoke with defendant and told him that if she was the female student's parents she would feel "very uncomfortable" that a teacher "liked" such photos. Although defendant told Ramirez he agreed with her, she thought his body language indicated he was upset with her (and defendant never spoke to Ramirez again thereafter). Ramirez reported the matter to the school's principal Dr. Constance Magee (Magee).

Magee told defendant she found his "likes" of the two photographs "inappropriate" and advised that such conduct could subject him to "allegations." He responded in an angry and defensive manner and called her a "prude."

### 2. Defendant's inappropriate touching of M.U.

M.U. graduated from Jordan High School in 2020. Although defendant was never one of her teachers, she often visited his classroom during lunch or on breaks. When she would leave his classroom, defendant would hug her.

Defendant's hugs made her feel "uncomfortable" because on two separate occasions three weeks apart, defendant's hands brushed her buttocks when he hugged her. Following the second incident, which occurred in 2018 and which she regarded as nonaccidental, she reported what happened to another teacher.

10

### 3.  *Defendant's inappropriate touching of L.B.*

L.B. graduated from Jordan High School in 2018.  While a student at the school, she was a member of the cheer and dance teams.  During her sophomore year, defendant, who claimed to have experience in cheer, attended practices of the cheer team.

On one occasion, defendant improperly lifted L.B.; instead of supporting her by placing the palm of his hand on her buttocks, he positioned his hand so that his thumb was on her vagina, which made her feel "embarrassed and . . . a little gross." L.B. reported the matter to her cheer coach and later made an official report to the school that defendant had touched her inappropriately.

### C.  *The Defense Case at Trial, Argument by Counsel, and Conviction and Sentencing*

At trial, defendant testified in his own defense.  He denied any inappropriate contact or communication with H.C. or M.S. Defendant testified he did not recall flirting with any student before he flirted with E.L.  And as to E.L., he maintained his sexual contact with her was consensual and the result of a change in their relationship after she turned 18 years old. Defendant also denied touching L.B. inappropriately or performing any stunts with cheerleaders.  Defendant claimed he, like many teachers and school administrators, would hug, shake hands, or pat students on the back as a way to greet them (and he was unaware of school policy forbidding such physical contact with students).  Defendant was not asked any specific questions concerning his interaction with M.U.

11

Other witnesses also testified during the defense case. One of defendant's former colleagues from Lindbergh Middle School, whose classroom was connected to defendant's by a short connecting passage with a small couch, testified he never saw defendant lying with a student on the couch or behave in an inappropriate manner with a student. L.B.'s cheer coach from Jordan High School testified L.B. never advised her that defendant touched her inappropriately while practicing a stunt. A defense forensic serologist testified that samples from the t-shirt E.L. was wearing during the alleged sexual assault contained both male and female DNA and opined that was because the female spit ejaculate on the shirt rather than the ejaculate contacting the shirt directly. Defendant's daughter told the jury that on the day her father allegedly sexually assaulted E.L., E.L. never came to her crying or saying that something was wrong.

During closing argument, the prosecution argued the jurors could use M.U. and L.B.'s testimony, if believed, "for the charged offenses. . . . [Y]ou can use [their testimony] to say 'Hey, this guy, the defendant, he has the disposition to commit sex offenses.'" The prosecutor also argued L.B. and E.L. "don't know each other at all. [L.B. and M.S.] don't know each other at all. [M.S. and M.U.] don't know each other at all. [Yet, a]ll of these kids have very similar stories. [¶] He touched [L.B.] on her vagina. He touched [M.S.] on her vagina. He touched [M.U.] over her hip and her butt and her thighs. Similar places he touched [H.C.]." The prosecutor further argued Ramirez and Magee's testimony revealed why defendant left Lindbergh Middle School at the end of the 2013 academic year: "It's no coincidence that he left. He let his mask fall with Dr. Magee that day. The red flag had gone

12

up, and he knew that she would never look at him with the same trust again. That there was always going to be that suspicion and he had to get out of there; so[,]he did."

After a brief period of deliberation (which the trial court would later describe as "basically a heartbeat"), the jury found defendant guilty on all counts. In addition, the jury found true multiple victim allegations under the so-called One Strike law (Pen. Code, § 667.61, subds (b), (j)(2), &(e)).

The trial court sentenced defendant to a total of 80 years to life in prison as follows: 25 years to life on count 1, 15 years to life on count 2, 15 years to life on count 3, and 25 years to life on count 6, the terms to be served consecutively. Finding that counts 4 and 5 were to be considered only if the jury found defendant not guilty on counts 2 and 3, the court dismissed those counts and vacated the convictions.

## II. DISCUSSION

Defendant challenges the admissibility of the other acts evidence, i.e., the testimony from L.B. (cheer practice vagina touching), M.U. (buttocks touching when hugging), and Ramirez and Magee (sexual social media interaction with minors). We hold there was no abuse of discretion in admitting the evidence under Evidence Code section 1101, subdivision (b),[3] which permits introduction of other acts evidence to prove intent and absence of mistake or accident.[4] (See generally *People v.*

---

[3] Undesignated statutory references that follow are to the Evidence Code.

[4] Because the challenge is to admissibility and we hold there was no abuse of discretion in admitting the evidence under section 1101, subdivision (b), we have no need to discuss the

*Daveggio and Michaud*, 4 Cal.5th 790, 824 ["A trial court's rulings admitting evidence under . . . sections 1101 and 1108 are reviewed for abuse of discretion"].) The other acts evidence admitted was sufficiently similar to the charged crimes to support an inference that defendant had the same intent and to conclude his conduct was not attributable to some mistake. The probative value of the other acts evidence was also not outweighed by a danger of undue prejudice—the other acts were not more inflammatory than the charged crimes and were not remote in time—and admission of the evidence did not confuse the issues or consume an undue amount of time.

Section 1101, subdivision (a) makes other uncharged acts "inadmissible when offered to prove [a defendant's] conduct on a specified occasion" except as specified in subdivision (b) of the statute. That provision allows a court to admit other acts "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than [the defendant's] disposition to commit such an act." (§ 1101, subd. (b).)

When determining whether other acts evidence is admissible for reasons specified in subdivision (b), "the degree of similarity . . . is often a key factor" (*People v. Jackson* (2016) 1 Cal.5th 269, 300), and "'[t]he least degree of similarity (between

admissibility of the evidence under section 1108, a statute that broadly permits evidence of a defendant's commission of another sexual offense in a trial in which the defendant is accused of a sex offense—so long as admitting evidence of the other sex offense evidence does not run afoul of section 352. (See generally *People v. Falsetta* (1999) 21 Cal.4th 903; *People v. Britt* (2002) 104 Cal.App.4th 500, 505.)

the uncharged act and the charged offense) is required'" to prove intent and the absence of mistake (*Daveggio and Michaud*, *supra*, 4 Cal.5th at 827).  To be relevant, there need only be "'sufficient evidence for the jury to find defendant committed both sets of acts, and sufficient similarities to demonstrate that in each instance the perpetrator acted with the same intent or motive.' [Citation.]" (*Ibid.*; see also *People v. Whisenhunt* (2008) 44 Cal.4th 174, 204; *People v. Ewoldt* (1994) 7 Cal.4th 380, 402 ["'[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . .'"].)  When relevant, the other acts evidence may be admitted if "'"[t]he probative value of the uncharged offense [is] . . . substantial and [is] not . . . largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury."'" (*People v. Thomas* (2011) 52 Cal.4th 336, 354.)

We are unpersuaded by defendant's argument that the other acts evidence admitted at his trial was too dissimilar from the charged offenses to be probative.  All of the conduct (charged and uncharged) involved females who were decades younger than defendant.  In addition, defendant was in a position of authority over each victim: he was the current or former teacher, or trusted father figure, for all of them before the abuse.  Further, the uncharged conduct involving L.B. and M.U. involved defendant's contact with intimate areas of their bodies, just like all the charged offenses.  Under the circumstances, the trial court reasonably determined admission of the other acts evidence had a

15

tendency in reason to prove—certainly with respect to the charged offenses involving H.C. and M.S. (*People v. Martinez* (1995) 11 Cal.4th 434, 452 [proof of intent to arouse the sexual desires of the perpetrator or the child required]), but also with respect to the offenses involving E.L.—that defendant had a prurient interest in young women that often left him unable to confine his behavior to appropriate standards and limits. The other acts also had a tendency in reason to disprove any defense contention that defendant's conduct could be explained away as being mistakenly interpreted or consensual on the victims' part. (*Ewoldt, supra*, 7 Cal.4th at 402 ["'[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state . . .'"]; see also *Whisenhunt, supra*, 44 Cal.4th at 204 [introducing evidence of absence of accident is not limited to instances when a defendant admits committing an act but denies the necessary intent for the charged crime because "a defendant's plea of not guilty puts in issue all the elements of the charged offense"].)

The trial court also reasonably determined that admitting the other acts evidence was consistent with section 352, which provides for exclusion of relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." When undertaking a section 352 analysis, courts frequently consider "'"(1) the inflammatory nature of the uncharged conduct; (2) the possibility of confusion of issues; (3) remoteness in time of the uncharged offenses; and (4) the amount of time involved in introducing and refuting the

evidence of uncharged offenses.'" [Citation.]" (*People v. Thomas* (2021) 63 Cal.App.5th 612, 630.)

In comparison with the charged offenses, the uncharged other acts evidence was no more inflammatory than the charged offenses—and markedly less so with respect to the charged offenses involving E.L. Indeed, even considered in isolation and not in relative terms to the charged offenses, the other acts evidence (social media "likes," brushing buttocks over clothes, and vaginal touching during a cheerleading hold) was not "so inflammatory as to divert the jury's attention or invite an irrational response." (*People v. Bivert* (2011) 52 Cal.4th 96, 118.) The other acts were also not remote in time from the charged conduct: M.U. and L.B. reported defendant's misconduct in 2018; defendant committed his offenses against H.C., M.S. and E.L., respectively, in 2012-2013, 2015, and 2018; and the Instagram posts by defendant occurred in 2013. The trial court also reasonably determined there was no likely prospect of juror confusion or undue consumption of time: just two additional subjects of inappropriate touching who testified to a total of three incidents, and social media testimony that was easily comprehensible and not extended.[5]

_____

[5] Insofar as defendant contends there was a risk of undue prejudice because defendant suffered no criminal punishment in connection with the acts described by L.B. and M.U. (because the jury would be tempted to convict on the charged offenses to punish defendant for the uncharged conduct), we see no such risk. The evidence of the charged and uncharged conduct was comparably strong and, as we have said, the charged offenses involved more reprehensible conduct. Indeed, for these reasons,

17

DISPOSITION

The judgment is affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


BAKER, Acting P. J.

We concur:



MOOR, J.



KIM (D.), J.

---

we believe the uncharged other acts evidence was unlikely to have significantly contributed to the verdicts obtained.


18